IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    v.                                          23-CR-99-LJV

SIMON GOGOLACK, et al.,

                 Defendants.

---

**RESPONSE IN OPPOSITION TO DEFENDANT SIMON GOGOLACK'S MOTION TO BE TRANSFERRED TO A DETENTION FACILITY LOCATED IN THE WESTERN DISTRICT OF NEW YORK**

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, Casey L. Chalbeck, Assistant United States Attorney, of counsel, hereby offers its response in opposition to defendant Simon Gogolack's motion to be transferred to a detention facility located in the Western District of New York, ECF No. 373, (filed Mar. 14, 2025).

## I.    INTRODUCTION

Defendant Simon Gogolack seeks to be transferred to a detention facility located in the Western District of New York. Specifically, he appears to claim that the combination of (1) distance between his current detention facility, Northeast Ohio Correctional Center ("NEOCC"), and counsel; (2) "insecure" video-teleconferencing technology; and (3) a "restrictive" protective order deprive him of his constitutional rights under the Sixth Amendment. *See generally* ECF No. 373 at 4 ¶¶ 10–11, 14; 5 ¶ 18.[1] But, as set forth below, other courts have rejected analogous claims of Sixth Amendment violations owing to

---

[1] The Court ordered the U.S. Marshals Service ("USMS") to respond by March 21, 2025. *See* Text Order, ECF No. 374, (dated Mar. 14, 2025). The undersigned counsel for the government conferred with the USMS on March 17, 2025, to discuss their position and is filing this response on their behalf.

comparable distances between counsel and client, and neither of Mr. Gogolack's other arguments are grounded in fact. NEOCC is the appropriate facility for Mr. Gogolack, who has committed numerous crimes and infractions while detained pretrial. Nevertheless, and notwithstanding Mr. Gogolack's behavioral issues, the USMS has identified potential measures that can be adopted to mitigate any burden pretrial detention may be exerting on Mr. Gogolack's ability to prepare a defense. Accordingly, the Court should deny Mr. Gogolack's motion.

## II.   FACTUAL & PROCEDURAL BACKGROUND

### A.   Mr. Gogolack's history of violent, disruptive, non-compliant, and otherwise criminal behavior during pretrial detention.

From August 23, 2023, through December 7, 2023, Mr. Gogolack was detained in Niagara County. While in Niagara County, Mr. Gogolack used the facility's telephone system to coordinate the sales of narcotics with his co-conspirator and former girlfriend, Cortnie Barber. Additionally, according to a phone call to Ms. Barber, Mr. Gogolack fought other inmates he referred to using racial epithets. On top of that, Mr. Gogolack either posted or directed another individual to post to his Facebook account a threat to sell his discovery to the media.

On or about December 8, 2023, Mr. Gogolack was transferred to NEOCC, a federal facility that houses 35 other defendants from this district subject to pre-trial detention. Since being moved to NEOCC, Mr. Gogolack has committed several infractions, including:

- On October 7, 2024, the FBI attempted to execute a search warrant authorizing them to seize Mr. Gogolack's DNA. Mr. Gogolack refused to comply and shouted at agents that "whatever the hard way is, let's do it the hard way", which agents interpreted as threats. Additionally, Mr. Gogolack shouted at facility staff and his attorneys.[2]

---

[2] Mr. Gogolack's contempt for the judicial process formed the foundation of the government's subsequent Motion for a Show Cause Order. *See* ECF No. 266, (filed Oct. 16, 2024).

- On November 22, 2024, Mr. Gogolack intentionally delayed the transport van from NEOCC to the United States District Court for the Western District of New York. After staff provided him verbal directives to come, Mr. Gogolack became agitated and yelled at staff. Subsequently, Mr. Gogolack threw an apple at a staff member; the apple ended up hitting a television, causing it to break.

- When Mr. Gogolack arrived at Court on November 22nd, he was separated from other inmates and placed in full restraints. Approximately 25 minutes after his arrival, Mr. Gogolack began banging on his cell door, slipped out of his waist restraint, and loosely placed the waist chain around his neck. When USMS personnel approached Mr. Gogolack, he stated that he needed to "take a shit". Later that day, after the hearing had concluded, Mr. Gogolack fell to the floor and refused to comply with the cuffing process.

- On November 26, 2024, USMS personnel contacted the FBI in regards to Mr. Gogolack. The USMS advised the FBI that Mr. Gogolack filed a PREA complaint against a guard alleging that the guard grabbed Mr. Gogolack's genitals and squeezed them. USMS personnel reviewed video surveillance footage of Mr. Gogolack's interactions with the guard; that footage revealed Mr. Gogolack's allegations to be false.

- Mr. Gogolack has been found in possession of contraband multiple times.

    - On June 26, 2024, Mr. Gogolack was found with a 9-inch homemade weapon in his waistband; the weapon was sharpened on one end and had a cloth handle on the other. A subsequent search of Mr. Gogolack's cell revealed an 8-inch homemade weapon sharpened on one end and featuring a cloth handle.

    - On December 27, 2024, staff recovered the following contraband from Mr. Gogolack's cell: (1) 8.5-inch silver metal item with a cloth handle; (1) 2.5-inch piece of metal with a white plastic handle; (1) 4-inch piece of metal with a black plastic handle; and (1) 13-inch piece of metal with a metal handle.

In sum, since being incarcerated, Mr. Gogolack has (1) continued his illegal narcotics distribution from jail; (2) refused to comply with a search warrant and behaved aggressively toward FBI agents; (3) intentionally delayed a transport from NEOCC to the Court; (4) slipped out of his restraints and placed them around his neck in such a way that suggests he

3

was attempting to commit suicide; (5) repeatedly acted in a dangerous and disruptive manner; (6) filed a false report against a facility guard; and (7) possessed dangerous weapons.

### B.  No detention facility located in the Western District of New York will agree to house Mr. Gogolack.

After receiving the Court's order, *see* ECF No. 374, the USMS called each local facility in the Western District of New York and inquired into whether they would house Mr. Gogolack. Each facility individually declined. In addition to his history of criminal behavior while detained pretrial, unavailable bed space limits the USMS's ability to transfer Mr. Gogolack to a local facility. Moreover, pursuant to the Intergovernmental Agreements ("IGAs") that govern the USMS's relationship with local, state-operated detention facilities, the USMS is unable to force local partners to accept a prisoner in USMS custody. NEOCC is the closest facility that the USMS can use to house Mr. Gogolack. Additionally, the USMS advised the undersigned that they are "lucky" that NEOCC has not requested Mr. Gogolack to be transferred to another federal facility—one even further away—due to his dangerous and disruptive behavior.

### C.  Mr. Gogolack cannot be housed with his co-defendants.

In January 2024, the Grand Jury returned a Second Superseding Indictment ("SSI") in this case. The SSI charged the following defendants who are presently detained: (1) Cortnie Barber; (2) Peter Gerace, Jr.; (3) Howard Hinkle, Jr.; and (4) John T. Ermin. Those defendants are detained in the following facilities:

| Defendants Other than Mr. Gogolack Who Have Been Charged Under the SSI and are Presently Detained ||  |
|---|---|---|
| No. | Name | Detention Facility |
| 1. | Cortnie Barber | Niagara County |

4

| 2. | Peter Gerace, Jr. | Chautauqua County |
|---|---|---|
| 3. | John T. Ermin | Livingston County |
| 4. | Howard Hinkle, Jr. | Niagara County |

To mitigate against obstruction concerns, Mr. Gogolack cannot be housed with these other defendants.

**D.     The Protective Order**

On November 7, 2024, the District Court entered a First Amended Protective Order governing access to discovery in this case. *See* First Am. Protect. Order, ECF No. 293, (filed Nov. 7, 2024) (hereinafter the "Protective Order"). The Protective Order delineates two categories of information. The first, labeled "Discovery Information", broadly encompasses "HSI and FBI case materials, investigative materials, materials relating to the execution of various search warrants, video footage, recorded jail calls, laboratory reports, extraction data [from] various electronic devices that were seized, and other items of evidence." *Id.* at 1. The second category refers to Addendum material—that is, a narrow subset of discovery identifying, among other details, personal identifying information (such as social security numbers) of either Crystal Quinn or a defendant, images or videos of Ms. Quinn and witnesses that do not include any of the defendants, and cellular data *excluding* incoming or outcoming communication involving Ms. Quinn, any potential witness, or any of the defendants. *Id.* at 3–4.

The Protective Order's restrictions treat these two categories of information differently. For example, whereas the Protective Order instructs that "no copies of material covered by the *Addendum* shall be provided to the defendants absent further order of the Court," *id.* at 2 (emphasis added), no such provision extends to material falling outside the

Addendum's scope. And because the Addendum applies only to a narrow subset of the discovery, that means that the defendants may possess copies of the vast majority of the discovery provided in this case. What is more, the Protective Order's restrictions regarding Addendum material do not prohibit the defendants from *viewing* the discovery but, rather, identify that their review should be done with counsel present, either in person or over video-teleconferencing technology. *See* Protective Order at 2 & n.3. Finally, the Protective Order provides that "counsel for the defendants . . . may apply to the Court for an order specifically permitting further disclosure of any Discovery Information." *Id.* at 3.

    **E.**    **Possible Mitigating Measures**

Though the USMS cannot transfer Mr. Gogolack to a facility local to the Western District of New York, there are other measures that defense counsel and/or the USMS can pursue to enable Mr. Gogolack to review the limited amount of discovery governed by the Addendum. First and foremost, counsel can use video-conferencing technology.[3] Second, counsel can travel to NEOCC to review in-person the discovery with Mr. Gogolack. Third, the USMS can transport Mr. Gogolack from NEOCC to review discovery in the courthouse. Specifically, Mr. Gogolack can be placed in one of USMS's secured interview rooms in the courthouse cell block. Any paperwork Mr. Gogolack's counsel wishes to share with Mr. Gogolack can be provided to USMS staff (without staples), who will then transfer it to Mr. Gogolack. Though Mr. Gogolack cannot have a laptop in the secure interview room, he can view his attorney's laptop through the glass security screen.

---

[3]    The defendants specifically sought to add a provision to the Protective Order enabling them to use video-conferencing technology to review discovery.

### III.   LEGAL FRAMEWORK

The Bail Reform Act requires that the "defendant . . . be afforded reasonable opportunity for private consultation with counsel."  18 U.S.C. § 3142(i)(3).  "Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the Court] has the statutory authority to protect [defendant's] access to counsel."  *Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995); *United States v. Emanuel*, No. 20 CR 0048 (NSR)-02, 2020 WL 1660121, at *9 (S.D.N.Y. Mar. 31, 2020) (similar).

But a "reasonable opportunity" does not mean an unlimited opportunity: pre-trial detention "will always interfere with preparation for trial to some extent . . . ."  *United States v. Argraves*, 3:09-CR-117, 2010 WL 283064, at *6 (D. Conn. Jan. 22, 2010).  Rather, under § 3142(i)(3), a "reasonable opportunity" for consultation with counsel must "allow defendants to review discovery that the Government intends to introduce at trial and to plan non-frivolous motions and other strategies."  *United States v. Rodriguez*, No. 12-CR-83S, 2015 WL 1120157, at *2 (W.D.N.Y. Mar. 12, 2015) (Scott, J.) (internal quotations and citations omitted).

Because § 3142(i)(3)'s "reasonable opportunity" provision is coextensive with the Sixth Amendment's right to effective assistance of counsel, Sixth Amendment jurisprudence is instructive.  *See Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) ("[P]rison regulations restricting pretrial detainees' contact with their attorneys [are] unconstitutional where they unreasonably burden[ ] the inmate's opportunity to consult with his attorney and to prepare his defense." (internal quotation marks and citation omitted)); *United States v. Argraves*, No. 3:09CR117MRK, 2010 WL 283064, at *6 (D. Conn. Jan. 22, 2010) (evaluating a § 3142(i)(3)

7

premised on distance between counsel and the defendant's detention facility through the prism of Sixth Amendment jurisprudence); *accord Bell v. Wolfish*, 441 U.S. 250, 547 (1979) ("[W]hen an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.").

### IV.  ANALYSIS

Mr. Gogolack claims that his transfer to a facility located in the Western District of New York is necessary for three reasons.  First, Mr. Gogolack asserts that defense counsel is unable to travel to NEOCC "regularly . . . given the distance and time requirements." Mot. to Transfer, at 7 ¶ 24.  Second, he speculates that "federal institutions" are monitoring his privileged communications with his attorney, such that he cannot use video-teleconferencing technology.  *See id.* at 7–8 ¶ 26.  Third, and relatedly, he avers that the Protective Order "in this case . . . prohibits [him] from possessing vast amounts of discovery" and that "the only way that counsel can both comply with the [P]rotective [O]rder and have Mr. Gogolack review discovery is to physically sit with him while he does." *Id.* at 8 ¶ 28.

As explained below, Mr. Gogolack's motion for transfer should be denied because (1) he has not established a violation of any law or constitutional right related to access to counsel as a pretrial detainee and (2) any inconvenience can be mitigated by either (i) his attorney's use of video-teleconferencing technology or (ii) the USMS transporting Mr. Gogolack to a secured interview room in the federal courthouse to facilitate in-person discovery review with his attorneys.

### A. Mr. Gogolack has not established a violation of a statutory or constitutional right related to his access to counsel as a pre-trial detainee.

Where, as here, a defendant claims that the inconvenience caused by the distance between defense counsel and a pretrial facility impermissibly intrudes on his Sixth Amendment right to counsel, courts look to whether the inconvenience has actually or constructively deprived the defendant of counsel and whether the defendant is actually prejudiced. *See, e.g.*, *Lucas*, 873 F.2d at 1280–81; *United States v. Echeverri*, No. 91–CR–885 (DRH), 1992 WL 81876, at *2 (E.D.N.Y. Mar. 31, 1992).

Multiple courts have considered claims analogous to Mr. Gogolack's, and each has rejected the proposition that distance-induced-inconvenience infringes upon a defendant's Sixth Amendment rights. For example, in *Lucas*, the Ninth Circuit found that a defendant's pretrial detention in a facility 120 miles away from his court-appointed counsel did not violate his Sixth Amendment right to counsel:

> Lucas's pretrial detention in a facility located two hours distant from the place of his trial did not prevent all communications between client and counsel. Lucas and his counsel were free to communicate by telephone; alternatively, Lucas's counsel could easily endure the inconvenience of a two-hour drive to Phoenix. And in any event, Lucas communicated freely with his counsel following a day of pretrial motions held in Tucson. We thus believe that his detention in the facility located in Phoenix rather than the one in Tucson did not amount to the actual or constructive denial of the assistance of counsel for which a showing of prejudice is not required.

873 F.2d at 1280–81.

Similarly, in *Argraves*, Judge Kravitz concluded that the defendant's pre-trial detention in a facility located approximately 110 miles away from his counsel did not impose a "level of inconvenience" amounting "to a denial of effective assistance of counsel." 2010 WL 283064, at *5. Likewise, in *Echeverri*, Judge Hurley determined that the defendant's

9

detention in a facility 100 miles outside of the Eastern District of New York did not amount to an unconstitutional burden on the defendant's constitutional rights, notwithstanding the fact that counsel was inconvenienced by the drive. 1992 WL 81876, at *2. And, in *United States v. Simonson*, a case involving hate-crime murder and murder-conspiracy allegations, Magistrate Judge Jensen concluded that, "[a]lthough lengthy travel is inconvenient and frequent meetings assist in providing a defense," the 150-mile distance between the defendant's pre-trial detention facility and his defense attorney did not merit transferring the defendant to another facility. 3:21-CR-50064-1, 2022 WL 6750331, at *2 (N.D. Ill. Oct. 11, 2022).

Three sets of facts require a similar finding in this case. First, Mr. Gogolack's attorneys do not claim that they have been *prevented* from meeting with him at NEOCC; rather, they cite the "day's trip" as an inconvenience. *See* Mot. to Transfer at 5 ¶ 17. But the 184-mile distance between the federal courthouse and NEOCC is comparable to the distances at issue in *Lucas* and *Simonson*, where the Ninth Circuit and the Magistrate Court, respectively, rejected the defendants' claims that the distance impermissibly burdened their Sixth Amendment right to counsel. As multiple courts have recognized, these inconveniences do "not deprive [the] defendant of his right to a reasonable opportunity to consult with counsel." *Echeverri*, 1992 WL 81876, at *2.

Second, insofar as Mr. Gogolack cites distance and travel time as inconveniences abridging his Sixth Amendment right to counsel, those are inconveniences shared by the attorneys for the other 35 defendants from this district who are detained pre-trial, all of whom,

10

via CJA or government funds, receive reimbursements for their travel.[4]  To grant Mr. Gogolack's motion would not only invite similar requests from other defendants but also, assuming the Court treated similarly situated defendants the same, effectively foreclose NEOCC as an option to detain WDNY defendants pre-trial.  Doing so would not only interfere with federal contracts with state facilities—who contractually cannot be required state facilities to house particular detainees—but also inappropriately supplant the USMS and its partners as the appropriate bodies to determine detainee placement.

Third, and relatedly, Mr. Gogolack's criminal and disruptive behavior while detained pretrial illustrates precisely why "the operation of our" pretrial detention "facilities is peculiarly the province of" the USMS—not the "[j]udicia[ry]."  *Bell*, 441 U.S. at 548.  For instance, while detained in Niagara County, Mr. Gogolack engaged in a narcotics conspiracy and fought with other inmates whom he referred to using racial epithets.  Since his transfer to NEOCC, Mr. Gogolack has refused to comply with court-issued search warrants, intentionally caused the delay of a transport van, acted in a manner consistent with attempting suicide, repeatedly disobeyed commands, filed a false report against an officer, made threatening comments to FBI agents, attempted to assault a facility staff member, broken a television, and possessed multiple pieces of contraband capable of inflicting serious bodily injury or death.  Considering this troublesome history, which Mr. Gogolack did not apprise the Court of, it should come as no surprise that state detention partners do not want to house him, as he presents a danger to facility staff, other inmates, and himself.  To transfer Mr. Gogolack to another facility in the face of his detention-related misconduct would reward him

---

[4]  It would come as a great surprise to the government if the Federal Public Defender's Office was wholesale failing to meet with clients detained in NEOCC, especially since the government is generally aware of CJA counsel traveling to NEOCC to meet with clients to review discovery and prepare defenses.

for his misdeeds and impose additional security strains onto institutions unwilling to house him (and that, in any event, cannot be forced to take him). Thus, to the extent Mr. Gogolack's own criminal conduct and misbehavior has resulted in his transfer to a more distant detention facility, he has only himself to blame for the inconveniences his attorneys now face in traveling to NEOCC. Accordingly, the Court should hold that the distance between Mr. Gogolack and his counsel does not amount to a Sixth Amendment violation.

Neither Mr. Gogolack's speculative and spurious suggestions of prosecutorial misconduct as to NEOCC's video-teleconferencing technology nor the existence of the Protective Order alter this conclusion. Though Mr. Gogolack's attorneys claim that the video conferencing technology at NEOCC is "not secure", and suggest that the government must be collecting and monitoring his privileged communications, the undersigned government counsel is unaware of any factual basis specific to NEOCC or the U.S. Attorney's Office for the Western District of New York in support of these respective allegations and insinuations. *See* Mot. to Transfer at 4 ¶ 14 ("[V]ideo conference at the facility is not secure . . . ."); *id.* at 7–8 ¶ 26 (discussing, for some reason, a report issued by the National Association of Criminal Defense Lawyers and stating that "electronic communications can easily be, and frequently are monitored in federal institutions, which are insufficient to adequately protect a defendant's right to effective assistance of counsel").

Mr. Gogolack's legal authority in support of his argument is also of dubious value here. Specifically, Mr. Gogolack's counsel cites *United States v. Black*, Case No. 16-20032-JAR, 2016 U.S. Dist. LEXIS 164571, (Nov. 29, 2016) for the proposition that "[t]he relief requested in this case *aligns* with *Black*." Mot. to Transfer at 8 ¶ 27 (emphasis added). But the facts in *Black* could not be more different than those at issue in this case. In *Black*, the

government "obtained and disseminated in discovery privileged audio and video recordings of communications between [Corrections Corporation of America] inmates and their attorneys." 2016 U.S. Dist. LEXIS 164571, at *3. As the *en banc* Tenth Circuit would later explain in *United States v. Hohn*, the *Black* investigation revealed that "the Kansas USAO had been obtaining and listening to recorded attorney-client jail calls between [ ] detainees and their attorneys for a wide variety of criminal cases." 123 F. 4th 1084, 1089 (10th Cir. 2024) (en banc). "Concerned about the constitutional ramifications of this practice, the district court ordered a Special Master to investigate the extent of the government's intrusions into . . . [the] detainees' attorney-client communications." *Id.*

As the district court recognized, and as Judges Rossman and Bacharach echoed in their *Hohn* dissent, *Black* and other cases implicated by that USAO's prosecutorial misconduct "called into question" the very "fairness of the adversary system." *Hohn*, 123 F. 4th at 1130 (Rossman, J., dissenting) (quoting *United States v. Carter*, 429 F. Supp. 3d 788, 903 (D. Kan. 2019) (Robinson, J.), *order vacated in part*, No. 16-20032-02-JAR, 2020 WL 430739 (D. Kan. Jan. 28, 2020)). In other words, the relief in *Black* that Mr. Gogolack's counsel claims is "align[ed]" with the request made here came on the heels of systemic violations to the attorney-client privilege committed by the United States Attorney's Office for the District of Kansas. Mot. to Transfer at 8 ¶ 27. Defense counsel has not—and, just as importantly, cannot—levy such accusations in good faith here.[5,6] Consequently, to the extent Mr.

---

[5] Given defense counsels' interest in prosecutorial misconduct issues afflicting the District of Kansas, they might consider reflecting upon the Tenth Circuit's admonition in *United States v. Caballero* that "baseless allegations of prosecutorial misconduct are not helpful to either the defendants or the profession." 277 F.3d 1235, 1250 (10th Cir. 2002).

[6] Not only is *Black* factually inapposite to this case, but nowhere in the *Black* opinion that Mr. Gogolack cites did the district court actually order the relief Mr. Gogolack claims it ordered and declares appropriate here—*viz.*, an order to USMS "to house such detainees in facilities as would not violate those rights" to privileged communications with their attorneys. *Id.* (citing *Black*, 2016 U.S. Dist. LEXIS 164571, at *5).

13

Gogolack's counsel premises his transfer request upon the notion that he cannot have privileged communications with his client over video-conferencing technology, the Court should deem such suggestions speculative and afford them no weight.

The Court should dispose of Mr. Gogolack's arguments regarding the Protective Order in like manner. In that vein, Mr. Gogolack argues that a "restrictive protective order" prevents him from possessing "vast" amounts of discovery. Mot. to Transfer at 4 ¶ 10, 8 ¶ 28. Putting aside the Protective Order's limited restrictions are justified by Mr. Gogolack's own threats to sell discovery to the media, his counsel's declaration that the Protective Order "prohibits" him "from possessing vast amounts of discovery" grossly mischaracterizes the order's limited restrictions. *Id.* at 8 ¶ 28.

The Protective Order only prohibits Mr. Gogolack from possessing material covered by the Addendum, such as documents including personal identifying information and images of Ms. Quinn. And though counsel refers to this material as "vast", he fails to support his characterization with any specific accounting of the discovery subject to the Addendum's terms. Indeed, the undersigned's understanding is that the discovery subject to the Addendum is quite limited. Moreover, to the extent Mr. Gogolack thinks that the Protective Order is impairing his inability to prepare a defense, the Protective Order explicitly authorizes his attorney to "apply to the Court for an order specifically permitting further disclosure of any Discovery Information." Protective Order at 3. Thus, notwithstanding Mr. Gogolack's unspecific and conclusory objections to the Protective Order, the order itself outlines a remedy that he has, thus far, declined to utilize.

In sum, none of the issues—real or imagined—that Mr. Gogolack complains of merit the relief he seeks in his Motion to Transfer: as other courts have recognized, the distance his

14

attorneys must travel to meet him does not deprive him of his constitutional rights; the implied and insinuated violation of the attorney-client privilege that purportedly renders video-teleconferencing "[in]secure" is purely speculative; and the Protective Order's limited restrictions on Mr. Gogolack's ability to possess the discovery are ones that his attorney could move to modify at any time.   Rather than interfere with the USMS's ability to safely detain a dangerous detainee, the Court should encourage Mr. Gogolack's attorneys to do what their colleagues do: travel to NEOCC and/or utilize video teleconferencing technology to meet with their client and review dsicovery.

      **B.**      **The USMS can facilitate Mr. Gogolack's defense preparations by transporting him to the courthouse so that his attorneys may review discovery with him in a secured interview room.**

Though the government objects to Mr. Gogolack's request for transfer, the USMS has nonetheless identified potential measures to mitigate any inconvenience Mr. Gogolack's detention in Ohio may impose on his ability to confer with his attorneys.  Specifically, the USMS can transport Mr. Gogolack from NEOCC to review discovery in the Courthouse. Under this option, Mr. Gogolack can be placed in one of USMS's secured interview rooms in the Courthouse cell block.   Any paperwork Mr. Gogolack's counsel wishes to share with Mr. Gogolack can be provided to USMS staff (without staples), who will then transfer it to Mr. Gogolack.  Though Mr. Gogolack cannot have a laptop in the secure interview room, Mr. Gogolack can view his attorney's laptop through the glass security screen.   This is more than enough to cure the distance-related inconvenience that Mr. Gogolack, in large part, premises his motion upon.

### V. CONCLUSION

For the reasons stated herein, the government respectfully requests that the Court deny Mr. Gogolack's Motion to Transfer (ECF No. 373).

DATED:  Buffalo, New York, March 21, 2025

          Michael DiGiacomo
          United States Attorney


BY:   s/ CASEY L. CHALBECK
      Assistant United States Attorney
      United States Attorney's Office
      Western District of New York
      138 Delaware Avenue
      Buffalo, New York 14202
      (716) 843-5881
      Casey.Chalbeck@usdoj.gov