IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.                                                   23-CR-99-EAW

SIMON GOGOLACK, et al.,

          Defendants.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT GOGOLACK'S OMNIBUS DISPOSITIVE MOTIONS**

MICHAEL DiGIACOMO
United States Attorney

BY:   s/ CASEY L. CHALBECK
       s/ NICHOLAS T. COOPER
       s/ JOSHUA A. VIOLANTI
       s/ JOSEPH M. TRIPI
       Assistant United States Attorney
       United States Attorney's Office
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York 14202
       (716) 843-5881
       Casey.Chalbeck@usdoj.gov

# Table of Contents

INTRODUCTION ............................................................................................................. 1

I.    The Court Should Deny Mr. Gogolack's Constitutional Speedy Trial Motion. ............ 1

    A.    Factual Background ............................................................................................. 2

        1.    The government's initial discovery production to Mr. Gogolack .......................... 2

        2.    Mr. Gogolack's adjournment of motions' deadlines ............................................ 3

        3.    The Second Superseding Indictment ................................................................. 3

        4.    Mr. Gogolack sought to extend—and then blew past—his motions deadline for the Superseding Indictment. ......................................................................................... 5

        5.    The government's good-faith discovery delay and ensuing sanctions litigation ..... 6

        6.    The Defendants' attempts to use an internal DOJ memorandum to inject delay into the case ........................................................................................................ 8

        7.    The government's motion to rescind the referral order and set a trial date .......... 11

        8.    Mr. Gogolack obtains new counsel following the emergence of a conflict of interest. ........................................................................................................... 12

    B.    Legal Framework ............................................................................................... 13

    C.    Analysis ............................................................................................................ 15

II.   Mr. Gogolack's *Brady* Motion Should Be Denied. .................................................. 20

III.  The Court Should Deny Mr. Gogolack's Motion for the Disclosure of Grand Jury Minutes. ............................................................................................................................ 22

    A.    Factual Background ........................................................................................... 22

    B.    Legal Framework ............................................................................................... 23

    C.    Analysis ............................................................................................................ 25

IV.   The Court Should Deny Mr. Gogolack's Motion for Disclosure and Severance. ..... 26

V.    The Court Should Deny Mr. Gogolack's Motion to Dismiss Due to Purported Multiplicity. ....................................................................................................................... 27

VI.   The Court Should Deny Mr. Gogolack's Motion to Dismiss Due to Purported Facial Insufficiency. ..................................................................................................................... 29

VII.  The Court Should Deny Mr. Gogolack's Motion to Suppress Statements. ............. 30

    A.    Relevant Background ......................................................................................... 31

    B.    Legal Framework ............................................................................................... 41

        1.    August 2, 2023, Traffic Stop and Depew PD Arrest ........................................ 41

2.    Miranda Warnings – Custody and Interrogation ............................................... 42

3.    Miranda – Right to Counsel and Invocation...................................................... 45

4.    Miranda – Subsequent Provision of Warnings After Prior Questioning .............. 48

5.    Miranda – Waiver of Rights .............................................................................. 49

6.    Sixth Amendment Right to Counsel .................................................................. 50

C.    Analysis.................................................................................................................. 50

1.    Mr. Gogolack's Statements to Law Enforcement on August 1, 2023 .................. 50

2.    Mr. Gogolack's Traffic Stop and Arrest on August 2, 2023 ............................... 51

3.    Mr. Gogolack's Statements to SA Jason Kammeraad on Scene of his Arrest...... 52

4.    Mr. Gogolack's Statement to the FBI inside of the Depew Police Department ... 53

VIII.    The Court Should Deny Mr. Gogolack's Motion to Suppress Cellular Telephone Evidence 55

A.    Factual Background ................................................................................................ 56

B.    Legal Framework ................................................................................................... 57

1.    Seizures of Electronic Devices Incident to Arrest.............................................. 57

2.    The Fourth Amendment's Particularity Requirement ........................................ 57

C.    Analysis.................................................................................................................. 59

IX.    The Court Should Deny Mr. Gogolack's Motion to Suppress the Fruits of the August 5, 2023, Search of 296 Scott Avenue. ................................................................................. 60

A.    Factual Background ................................................................................................ 61

B.    Analysis.................................................................................................................. 63

X.    The Court Should Deny Mr. Gogolack's Motion to Suppress the Fruits of the September 14, 2023, Search of 296 Scott Avenue.......................................................................... 64

## INTRODUCTION

On December 1, 2025, Mr. Gogolack filed ten motions with this Court, seeking various forms of relief, including the dismissal of his indictment on constitutional speedy trial grounds, the disclosure of purported *Brady* material, the inspection of grand jury minutes, and myriad motions to suppress statements or the fruits of warrant-supported searches. Because Mr. Gogolack fails to meet any of his many burdens, the Court should deny his omnibus dispositive motions in full.

**I.    The Court Should Deny Mr. Gogolack's Constitutional Speedy Trial Motion.**

Mr. Gogolack first moves to dismiss the Second Superseding Indictment on constitutional speedy trial grounds. *See* Gogolack Disp. Mots., Dkt. 690, at 6–16 ¶¶ 23–57. Specifically, Mr. Gogolack claims that three separate government actions have resulted in a delay of 16 months and three weeks: (1) the government's failure to timely provide discovery; (2) the government's alleged failure to timely provide *Brady* material; and (3) the delay following the government's "death penalty decision". *Id.* at 8–11 ¶¶ 32–44. Coupled with his own alleged repeated assertions of his speedy trial right and the anxiety he has faced while in pre-trial detention, Mr. Gogolack urges that these delays necessarily require the dismissal of the indictment.

Mr. Gogolack's motion should be denied for two reasons. First, it is premised upon an inaccurate assessment of the facts that simultaneously inflates the government's contribution to his trial delays while minimizing delays invited by the defendants. Second, the law in this circuit establishes that the delay Mr. Gogolack complains of does not rise to the level of a constitutional speedy trial violation, especially where Mr. Gogolack fails to meaningfully demonstrate any prejudice.

### A.     Factual Background

### 1.     The government's initial discovery production to Mr. Gogolack

On August 17, 2023, the U.S. Attorney's Office charged Mr. Gogolack by Criminal

Complaint with the following offenses:

| Criminal Complaint Count Table | | |
|---|---|---|
| Count No. | Description | Statutory Citation |
| Count 1 | Felon in possession of a firearm and ammunition | 18 U.S.C. § 922(g)(1) |
| Count 2 | Possession of a firearm in furtherance of drug trafficking | 18 U.S.C. § 924(c)(1)(A)(i) |
| Count 3 | Unlawful user of controlled substances in possession of a firearm and ammunition | 18 U.S.C. § 922(g)(3) |
| Count 4 | Maintaining a drug-involved premises | 21 U.S.C. § 856(a)(1) |
| Count 5 | Narcotics conspiracy | 21 U.S.C. § 846 |

*See* Dkt. 1.

Thirteen days later, on August 30, 2023, the government provided substantial

discovery related to both charged and uncharged conduct to defense counsel. *See* Exhibit A,

Discovery Ltr., (dated Aug. 30, 2023). Then, on September 13, 2023, a grand jury returned

a 5-count indictment against Mr. Gogolack that re-alleged the offenses charged by Complaint.

*See* Dkt. 12.

A week later, the grand jury returned a thirteen-count superseding indictment. *See*

Dkt. 18. In addition to the first five charges reflected in the Complaint and initial Indictment,

the Superseding Indictment alleged violations of the following:

| Superseding Indictment Count Table | | |
|---|---|---|
| Count No. | Description | Statutory Citation |
| Count 6 | Kidnapping – Victim 1 | 18 U.S.C. § 1201(a)(1) |
| Count 7 | Kidnapping – Victim 2 | 18 U.S.C. § 1201(a)(1) |
| Count 8 | Witness tampering – Victim 1 | 18 U.S.C. § 1512(b)(1) |
| Count 9 | Witness tampering – Victim 1 | 18 U.S.C. § 1512(b)(2)(A) |
| Count 10 | Witness tampering – Victim 1 | 18 U.S.C. § 1512(b)(3) |
| Count 11 | Witness tampering – Victim 2 | 18 U.S.C. § 1512(b)(1) |
| Count 12 | Witness tampering – Victim 2 | 18 U.S.C. § 1512(b)(2)(A) |

2

| Count 13 | Witness tampering – Victim 2 | 18 U.S.C. § 1512(b)(3) |

*See id.* at 5–8.

The Magistrate Court ordered discovery produced by October 16, 2023. *See* Scheduling Order, Dkt. 21, (dated Sept. 25, 2023). By then, however, the government had already provided Mr. Gogolack substantial discovery. *See* Exhibit A. Moreover, on September 8, 2023, the government provided Mr. Gogolack with additional early discovery, which he supplemented with a bates-stamped production on October 19, 2023. *See* Exhibit B, Discovery Ltrs., (dated Sept. 8, 2023 and Oct. 19, 2023).

### 2. Mr. Gogolack's adjournment of motions' deadlines

On September 14, 2023, the Magistrate Court granted Mr. Gogolack 70 days, or until November 22, 2023, to file dispositive motions. See Dkts. 15, 17. On November 22, 2023, the Magistrate Court extended Mr. Gogolack's time to file motions, at his behest, to December 15, 2023. *See* Dkt. 21. Two days before his motions were due, Mr. Gogolack moved to adjourn his motions deadline for thirty days. *See* Dkt. 22. The Magistrate Court granted that request, ordering Mr. Gogolack to file all dispositive and non-dispositive motions by January 16, 2024. Dkt. 23 at 1.

### 3. The Second Superseding Indictment

On January 5, 2024, the grand jury returned a Second Superseding Indictment that charged Mr. Gogolack with four offenses relating to the death of Crystal Quinn and otherwise realleged the offenses levied against him in the Complaint, initial Indictment, and first Superseding Indictment, as illustrated below:

| Second Superseding Indictment Count Table | | | |
|---|---|---|---|
| Count No. | Description | New Charge | Defendants |
| Count 1 | Conspiracy to Obstruct Justice and Defraud the United States in violation of 18 U.S.C. §§ 371 and 1503 | Yes | Gogolack Gerace Ermin Roncone Hinkle Knight |
| Count 2 | Witness tampering conspiracy in violation of 18 U.S.C. § 1512(k) | Yes | Gogolack Gerace Ermin Hinkle |
| Count 3 | Witness retaliation Conspiracy in violation of 18 U.S.C. § 1513(f) | Yes | Gogolack Gerace Ermin Hinkle |
| Count 4 | Distribution of fentanyl resulting in death in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | Yes | Gogolack |
| Count 6 | Narcotics conspiracy in violation of 21 U.S.C. § 846 | No – alleged in Compl., Indict., and S.I. as to Gogolack | Gogolack Barber Byrd |
| Count 7 | Maintaining a drug-involved premises in violation of 21 U.S.C. § 856 | No – alleged in Compl., Indict., and S.I. as to Gogolack | Gogolack |
| Count 8 | Possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i) | No – alleged in Compl., Indict., and S.I. as to Gogolack | Gogolack |
| Count 9 | Felon in possession of a firearm and ammunition August 8, 2023, in violation of 18 U.S.C. § 922(g)(1) | No – alleged in Compl., Indict., and S.I. as to Gogolack | Gogolack |
| Count 10 | Unlawful user of controlled substances in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(3) | No – alleged in Compl., Indict., and S.I. as to Gogolack | Gogolack |
| Count 11 | Kidnapping – Victim 1 in violation of 18 U.S.C. § 1201(a)(1) | No – alleged in S.I. as to Gogolack | Gogolack Barber |
| Count 12 | Kidnapping – Victim 2 in violation of 18 U.S.C. § 1201(a)(1) | No – alleged in S.I. as to Gogolack | Gogolack Barber |

4

| Count 13 | Witness tampering – Victim 1 in violation of 18 U.S.C. § 1512(b)(1) | No – alleged in S.I. | Gogolack |
|---|---|---|---|
| Count 14 | Witness tampering – Victim 1 in violation of 18 U.S.C. § 1512(b)(2)(A) | No – alleged in S.I. | Gogolack |
| Count 15 | Witness tampering – Victim 1 in violation of 18 U.S.C. § 1512(b)(3) | No – alleged in S.I. | Gogolack |
| Count 16 | Witness tampering – Victim 2 in violation of 18 U.S.C. § 1512(b)(1) | No – alleged in S.I. | Gogolack |
| Count 17 | Witness tampering – Victim 2 in violation of 18 U.S.C. § 1512(b)(2)(A) | No – alleged in S.I. | Gogolack |
| Count 18 | Witness tampering – Victim 2 in violation of 18 U.S.C. § 1512(b)(3) | No – alleged in S.I. | Gogolack |

*See* Dkt. 24.

In other words, as to Mr. Gogolack, the only difference between the Second Superseding Indictment and its predecessor is the inclusion of the first four charges. Compare *id.*, with Dkt. 18. Nevertheless, the Magistrate Court's January 16th motions deadline came and went without Mr. Gogolack filing any dispositive or non-dispositive motions, seeking an extension, or asking the Court to be heard on the five charges that he been pending against him since August 23, 2023 or eight charges alleged against him in the September 2023 Superseding Indictment.

4. **Mr. Gogolack sought to extend—and then blew past—his motions deadline for the Superseding Indictment.**

After the grand jury returned the Second Superseding Indictment, Mr. Gogolack requested the appointment of learned counsel over the government's objection, a request the Magistrate Court granted. *See* Minute Entry, Dkt. 53, (dated Jan. 31, 2024); Text Order, Dkt. 54, (dated Jan. 31, 2024). Two days later—and notwithstanding his purported need to prepare for a death penalty case—Mr. Gogolack moved to reopen his detention hearing. *See* Dkt. 55. On February 15, 2024, the Magistrate Court granted Mr. Gogolack's motion. *See* Dkt. 61. The Magistrate Court held a detention hearing on March 1, 2024, and then continued it until

April 15, 2024, at which point the Magistrate Court denied Mr. Gogolack's motion for release.  *See* Dkts. 83, 116.

### 5. The government's good-faith discovery delay and ensuing sanctions litigation

During this litigation, the parties convened for a status conference wherein the Magistrate Court ordered the government to produce discovery by May 23, 2024, and scheduled a status conference for June 3, 2024.  *See* Dkt. 73.  The defendants agreed to exclude time from February 23, 2024, through June 3, 2024.  *See* Status Conf. Tran., at 17, (dated Feb. 23, 2024).

Shortly before the discovery deadline, the government—whose counsel had been engaged in a 3-month-long public corruption trial earlier in the year—realized that there was no protective order in place governing the handling and dissemination of discovery.  After private negotiations amongst the parties failed, the government raised the issue of the discovery delay and the absence of a protective order during the June 3rd status conference, and moved both for the issuance of a protective order and for the exclusion of time under the Speedy Trial Act.  *See* Dkt. 120.  The Magistrate Court declined to exclude time, ordered the government to produce the discovery on an attorney's eyes only basis, and scheduled briefing on the issue of the protective order.  *See id.*; Dkt. 122.  At that time, Mr. Gogolack's counsel filed an affirmation objecting to any exclusion of time, but did not at any point demand a speedy trial.  *See* Dkt. 121.

Between June 3, 2024, and November 21, 2024, the parties litigated whether a protective order was necessary to manage discovery in a case involving a murdered federal witness and to what extent, if at all, the government should be sanctioned for the discovery delay.  *See, e.g.*, Gov. Mot. Protective Order, Dkt. 129, (dated June 10, 2024); Def. Gogolack

Mot. Sanctions, Dkt. 131, (dated June 10, 2024); Def. Gerace Mot. Sanctions, Dkt. 132, (dated June 10, 2024); Def. Gerace Mem. Opp. Gov. Ex Parte Mot. Protective Order, Dkt. 136, (dated June 13, 2024); Gov. Mem. Re. Authority to File Ex Parte App. Protective Order, Dkt. 138, (dated June 13, 2024); Gov. Resp. Opp. Mots. Sanctions, Dkt. 142, (dated June 14, 2024); Def. Gogolack Resp. Opp. Re. Protective Order, Dkt. 146, (dated June 20, 2024); Def. Gerace Mot. to File Resp. Gov. Mot. Protective Order Ex Parte, Dkt. 149, (dated June 20, 2024); Gov. Resp. Opp. Def. Gerace Mot. to File Resp. Ex Parte, Dkt. 151, (dated June 21, 2024); Def. Gerace Resp. Opp. Mot. Protective Order, Dkt. 153, (dated June 26, 2024); Def. Gogolack Mot. Adjourn Oral Arg., Dkt. 154, (dated June 28, 2024); Gov. Resp. Opp. Def. Gogolack Mot. Adjourn Oral Argu., Dkt. 157, (dated July 1, 2024); Gov. Am. Mot. Protective Order, Dkt. 156, (dated June 28, 2024); Def. Gogolack Mem. Opp. Gov. Am. Mot. Protective Order, Dkt. 162, (dated July 12, 2024).

On July 29, 2024, the Magistrate Court issued a Decision and Order concluding that the government acted in bad faith in declining to turnover the discovery in the absence of a protective order. *See* Dkt. 173. On August 23, 2024, at the defendants' behest, the Magistrate Court imposed a "three-prong" sanction against the government for the 10-day discovery delay: (1) precluding the government's participation in litigating a protective order; (2) three months' constitutional speedy trial time charged to the government; and (3) disqualification of the trial team. Dkt. 200 at 5–7. The government appealed and, after more litigation, the District Court vacated the Magistrate Court's bad faith finding, reversed its disqualification sanction, and permitted the government to participate in litigation concerning the protective order. *See generally United States v. Gogolack*, 1:23-CR-99, 2024 WL 4851002, (W.D.N.Y. Nov. 21, 2024). However, as a sanction unobjected to by the government, the Court charged the

government with 5 months of constitutional speedy trial time, from mid-June through the conclusion of the appeal in November 2024.  *See id.* at *7.

### 6.    The Defendants' attempts to use an internal DOJ memorandum to inject delay into the case

The government has sought to bring this case to trial, despite the defendants' collective and repeated efforts to inject delay.  In that regard, Mr. Gogolack argues that he has suffered a 2 month delay attributable to the Attorney General's February 5, 2025, Memorandum concerning death penalty decisions, which was released approximately two weeks before the defendants' February 21, 2025, motions deadline.  *See* Disp. Mots., at 11 ¶¶ 42–44. Specifically, he claims that the government was responsible for delaying the case from February 21, 2025, through April 16, 2025.  *Id.* at ¶ 43.

By way of background, on February 5, 2025, the newly sworn Attorney General of the United States issued an internal guidance memorandum to all Department of Justice ("DOJ") employees entitled: "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions."  In the memorandum, the Attorney General made clear: "[T]his guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States . . . ."  The memorandum further directed DOJ attorneys at the Capital Review Committee to review no seek decisions in all pending capital eligible cases between January 20, 2021, and January 19, 2025, and it provided them with 120 days to complete the internal review process.

On February 6, 2025, the Magistrate Court entered a Text Order which read: "Although the government previously stated that it would not seek the death penalty against defendants Gogolack, Gerace, Ermin and Hinkle, the Department of Justice has now decided

to reconsider such determinations in all death penalty eligible cases. In light of that recent development, a conference will be held on 2/10/2025 at 2:00 p.m. in the Genesee Courtroom, 6th Floor West, 2 Niagara Square, Buffalo, NY to discuss whether additional *learned counsel* should be appointed." *See* Dkt. 350. The Court's Text Order was prompted by an *ex parte* submission by the Federal Public Defender, whose office at that time represented Mr. Gogolack in this case. *See* Status Conf. Tran., at 29, (dated Feb. 10, 2025).

On February 10, 2025, the Magistrate Court held a status conference and inquired as to whether the government had any information beyond that what was contained in the Attorney General's memorandum. The government did not have any additional information to report, and no specific information that the status of this case would change. Consistent with the Attorney General's guidance, the government argued that DOJ internal guidance did not create any rights for the defendants and urged the Magistrate Court to refrain from assigning learned counsel. The government stressed that prematurely and unnecessarily assigning additional attorneys would—as it has—create more delays in this case. In particular, the government stated, in part

> [T]he new [defense] attorneys would want to weigh in on what motions to file and how to proceed with the case. And we're now 11 days away from motions being due. I imagine it would take a day or two for the Court to get attorneys. Even if you did it this afternoon, that's leaving ten days for the current attorneys to communicate with the new attorneys, review a very significant amount of discovery that's been provided and make determinations, which, ultimately, right now, we have a no seek. I have no reason to believe that that's going to change, other than the memo saying all decisions are going to be looked at.

*Id.* at 10–11.

Mr. Gogolack responded, in relevant part, that he was trying to avoid is a situation where six months from now, this does become a death penalty case. And motions have been

filed and things have been done that can't be undone," even though such an event would plainly be grounds to reopen motions in this district. *See id.* at 22:17–21. Following the input of the other defendants, the Magistrate Court indicated it would hold off on the decision to assign learned counsel and decided to hold the February 21, 2025, motions deadline in abeyance pending a status conference on March 5, 2025. *Id.* at 31–38.

The government moved to exclude time between February 10, 2025, and March 5, 2025, pursuant to 18 U.S.C. §§ 3161(h)(7)(A) and (h)(7)(B)(iv) because the delay was prompted by four defendants "asking for the Court to appoint learned counsel." *Id.* at 47:02–07. Additionally, the government argued that excluding time was appropriate because the defendants sought an adjournment of the upcoming motions dead "so that they [would] have an opportunity, if the posture of th[e] case change[d] to get the input from that additional counsel about how motions should be filed, what motions should be filed, and to review discovery with those additional attorneys." *Id.* at 47:08–12. Counsel for Mr. Gogolack responded: "Judge, we don't have an objection. You know, I think we — we've made the record clear as to — as to why it is we think, you know, motions can't be filed on the 21st." Id. at 47:17–20; *see also id.* at 48:01–02 ("[W]e don't have an objection to that speedy trial exclusion, for the reasons that have been articulated today.").

Next, on March 5, 2025, the parties convened for a status conference on a scheduling order. Through counsel for Mr. Gerace, all the defendants sought a motions deadline that bifurcated dispositive and non-dispositive issues. *See* Status Conf. Tran., at 31:18–22 ("I think an appropriate compromise may be—and the defense has, as a group, we have spoken about it—maybe if the Court is included to set a scheduling order, to set a date for nondispositive motions bifurcated in other words."). The government opposed the bifurcated schedule,

arguing that it would inject further delay into the case and "create[] tactical advantages down the road, when [the defendants] try to file speedy trial motions." *Id.* at 38:16:–18. The Magistrate Court granted the defendants' request anyway, set a deadline for non-dispositive motions, and scheduled oral argument for May 21, 2025. The government moved to exclude time from March 5, 2025, through May 21, 2025, pursuant to 18 U.S.C. §§ 3161(h)(7)(A) and 3161(h)(7)(B)(iv), on account that the interests of justice associated with enable the defendants to prepare non-dispositive pre-trial motions outweighed the defendants' right to a more speedy trial. *Id.* at 37:05–14. No defendant objected to the exclusion. *Id.* at 37:15–16.

**7.      The government's motion to rescind the referral order and set a trial date**

Following oral argument on the defendants' non-dispositive motions, the government—to move speedily move the case to trial—moved the Court to rescind its referral order to the Magistrate Court and set a trial date, which Mr. Gogolack opposed. *See* Mot. Rescind Referral Order & Schedule Tr. Date, Dkt. 435, (May 28, 2025); Status Conf. Tran., at 4–5, (dated June 9, 2025) (counsel for Mr. Gogolack indicating that he joined in Mr. Gerace's opposition to the government's motion).

During the June 9, 2025, oral argument before the District Court on the government's motions, counsel for Mr. Gogolack specifically opposed setting a trial date, arguing that the specter of severance—and, with it, "multiple trials"—militated against scheduling the case for trial. Status Conf. Tran., at 21:22–25. Indeed, Mr. Gogolack argued against setting a trial date "because that's going [to] allow for the most effective briefing of dispositive issues, to allow it to effectuate Mr. Gogolack's rights, and allow us to best prepare a defense." *Id.* at 24:03–07.

In response, counsel for the government and the Court had the following exchange:

11

AUSA Cooper:     I just want to — I'm aware of the 2nd Circuit law . . . about the government being responsible for pushing forward the speedy trial. And that's something I'm very cognizant of in this case given the five-month sanction, which the government understands, I'm not complaining about it, but I'm operating with the knowledge that there's a five-month period of time under constitutional speedy trial that's being counted against the government.

    And the defendants, at certain times, will say we wanted a speedy trial all along, we were demanding it.

    I'm here today asking you to set a trial date, and I'm asking them essentially, respectfully, to put their money where their mouth is and let's pick a trial date, because —

THE COURT:     Do any defendants want me to set a trial date today? Raise your hand. I don't see any hands. Okay. So no one wants a trial date set today. So you have it on the record, Mr. Cooper. You are pushing for a trial date. You urged me to set a trial date. The defendants have asked me not to set a trial date. I'm not going to do that. But this certainly should not be -- I'm saying this on the record right now -- this certainly should not be to the disadvantage of the government, because the government is doing everything that it can and then some to get me to set a trial date today.

**8.    Mr. Gogolack obtains new counsel following the emergence of a conflict of interest.**

On June 13, 2025, the government provided defense counsel to Mr. Gogolack early 3500 disclosures, including ████████ transcripts related to ██████████. On June 24, 2025, counsel for Mr. Gogolack moved to withdraw as counsel, citing the Federal Public Defender's Office's previous representation of ████████. *See* Dkt. 462. On July 14, 2025, the District Court granted the FPD's motion to withdraw and appointed current counsel. *See* Minute Entry, Dkt. 483, (dated July 14, 2025).

After the case transferred to this Court, the Court ordered all defendants, except for Messrs. Gogolack and Frank Knight, to file their dispositive motions by August 8, 2025. Minute Entry, Dkt. 527, (dated July 31, 2025). The Court ordered Mr. Gogolack to file his dispositive motions by December 1, 2025, to afford new counsel time to get up to speed.

### B.    Legal Framework

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . .. U.S. CONST. AMEND. VI. The absence of a Speedy Trial Act violation does not automatically defeat a Sixth Amendment speedy trial claim. *See* 18 U.S.C. § 3173. Numerous courts, however, have held that it will be an "'unusual case in which the Act is followed but the Constitution violated.'" *United States v. Rodriguez-Mendez*, No. 22-1422, 2023 WL 3378005, at *4 (3d Cir. May 11, 2023) (citation omitted); *United States v. Koerber*, 10 F.4th 1083, 1109 (10th Cir. 2021); *United States v. Rice*, 746 F.3d 1074, 1081 (D.C. Cir. 2014); *United States v. Bieganowski*, 313 F.3d 264, 284 (5th Cir. 2002); *United States v. Davenport*, 935 F.2d 1223, 1238-39 (11th Cir. 1991); *United States v. Nance*, 666 F.2d 353, 360 (9th Cir. 1982); *United States v. Feeterman*, 21-CR-44-LJV, 2023 WL 2782287, at *11 (W.D.N.Y. Apr. 5, 2023). "Even more exceptional must be the case in which the Act is followed but there is a 'clear or obvious' Sixth Amendment error." *Rice*, 746 F.3d 1081.

The speedy-trial right is "amorphous," "slippery," "necessarily relative," and "depend[ent] upon [the] circumstances" of each case. *Barker*, 407 U.S. at 522 (quoting *Beavers v. Haubert*, 198 U.S. 77, 87 (1905)). The right therefore cannot be measured in a finite number of days, months, or years, "largely because what may be considered 'speedy' is necessarily dependent on the nature of the trial and the parties' interests in the given case." *United States v. Tufino*, No. 20-CR-81S, 2021 WL 1788521, at *2 (W.D.N.Y. May 5, 2021) (citing *United*

13

*States v. Ghailani*, 733 F.3d 29, 41 (2d Cir. 2013)); *Barker*, 407 U.S. at 521 ("It is . . . impossible to determine with precision when the right has been denied. We cannot definitively say how long is too long in a system where justice is supposed to be swift but deliberate."); *United States v. Ewell*, 383 U.S. 116, 120 (1966) ("A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."); *United States v. Ray*, 578 F.3d 184, 191 (2d Cir. 2009) (noting that the right "neither prohibits all delays, nor establishes a strict time limit between the announcement of a charge and the commencement of trial")).

There is a fundamental "difference between the right to speedy trial and the accused's other constitutional rights." *Barker*, 407 U.S. at 521. Although pretrial delays can harm the defendant, sometimes "deprivation of the right may work to the accused's advantage." *Id.* For example, "witnesses may become unavailable or their memories may fade," which may weaken the prosecution's case if it depends on witness testimony. *Id.* "Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself." *Id.*

Accordingly, in *Barker*, the Supreme Court refused to "quantif[y]" the right "into a specified number of days or months" or to hinge the right on a defendant's explicit request for a speedy trial. *Id.* at 522–25. Rejecting such "inflexible approaches," *Barker* established a "balancing test, in which the conduct of both the prosecution and the defendant are weighed." Id. at 529–30. The Supreme Court promulgated a four-factor test to determine whether the right to speedy trial has been violated: (1) length of delay; (2) reason for the delay; (3) defendant's assertion of the right; and (4) prejudice. *Id.* at 533. Regarding the four factors, the Supreme Court held that:

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Id.* at 533.

"The length of delay is considered a 'triggering mechanism': if the delay is not sufficiently long, there is no need to consider the other factors." *United States v. Swinton*, 797 F. App'x 589, 594 (2d Cir. 2019) (citing *Barker*, 407 U.S. at 530). There is no bright-line rule for when a delay begins to infringe a defendant's speedy trial right; when unlawful infringement starts depends "upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31. Once the fact of a sufficiently long delay has been established, "the burden is upon the government to prove that the delay was justified and that [defendant's] speedy trial rights were not violated." *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 377 (2d Cir. 1979).

### C.    Analysis

On balance, the *Barker* factors weigh strongly against finding a Speedy Trial violation.

*Length of the Delay*. First, with respect to the length of the delay, though Mr. Gogolack has been detained since August 2023, the 33-month period between then and his June 2026 trial is not unconstitutionally long. Indeed, the Second Circuit has found no constitutional violation in cases involving the same or substantially longer delays. *See, e.g.*, *United States v. Cyphers*, 556 F.2d 630, 635-36 (2d Cir. 1977) (thirty-three months); *see also United States v. Swinton*, 797 F. App'x 589, 594 (2d Cir. 2019) (fifty-seven months); *United States v. Lane*, 561 F.2d 1075, 1078-79 (2d Cir. 1977) (fifty-eight months). Even if the duration of the delay prompts consideration of the other *Barker* factors, those factors weigh in the government's

15

favor, as most of the delay has been prompted by the defendant and thus reflects his waiver of his speedy trial rights. *See Doggett v. United States*, 505 U.S. 647, 651 (1992) (noting that the second *Barker* factor requires courts to consider the reason for delay and evaluate "whether the government or the criminal defendant is more to blame"); *Barker*, 407 U.S. at 529 ("[I]f delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine.").

*The Reason for the Delay*. Mr. Gogolack—not the government—is the primary proponent of delay in this case. Contrary to Mr. Gogolack's assertions, discovery delays did not prolong this case by nine months and three weeks. Though the government accepts that as a consequence to its two-week delay in producing discovery and its successful appeal of the Magistrate Court's order concluding that the trial team acted in bad faith, it would be sanctioned with 5 months of constitutional speedy trial time, the remainder of the time calculated by the defendant is severely inflated. The government did not, as Mr. Gogolack contends, fail to provide discovery between October 16, 2023, and February 23, 2024. *See* Dkt. 690 at 8 ¶ 33. In fact, the government provided Mr. Gogolack substantial discovery on August 30, 2023, September 8, 2023, and then in bates-stamped formatting on October 19, 2023. *See* Exs. A, B.

Nor is Mr. Gogolack correct in suggesting that the exclusion of time between February 23, 2024, and May 23, 2024, is nullified due to the government's two-week delay in providing discovery to the defense on June 5, 2024. *See* Dkt. 690 at 8 ¶ 33. Mr. Gogolack, through another defense attorney, agreed to exclude time between February 23, 2024, and June 3, 2023. *See* Status Conf. Tran., at 17, (dated Feb. 23, 2024). The government used that time as it represented it would: by preparing and itemizing voluminous discovery in this case. That

16

the government was two-weeks late in distributing that discovery due to witness safety concerns—a good-faith error already punished by the Court's imposition of a five-month constitutional speed trial sanction—should not result in the defendant reaping an additional four-month speedy-trial windfall.

Likewise, the government is not the primary culprit behind the many adjournments that have delayed Mr. Gogolack's ability to bring dispositive motions to the Court. Mr. Gogolack could have filed motions in November 2023, when they were initially due. *See* Dkts. 15, 17. Instead, he filed adjournment after adjournment, until the Magistrate Court ordered him to file motions on January 16, 2024, a deadline he readily ignored. *See* Dkts. 21, 22, 23. Even then, as he awaited the government's discovery production for the Second Superseding Indictment, Mr. Gogolack failed to diligently prepare his motions on the 13 charges pending from his first Superseding Indictment, opting instead to relitigate the issue of his pre-trial detention.

Moreover, after the sanctions litigation concluded in 2024 and the Magistrate Court set a motions deadline of February 21, 2025, Mr. Gogolack, along with his co-defendants, moved to delay the case by seeking the appointment of learned counsel, even though the Second Superseding Indictment could not legally subject Mr. Gogolack to capital punishment. After that, Mr. Gogolack doubled down on his scheme to prolong the case by successfully advocating for a bifurcated motions schedule, the most inefficient litigation format available in the federal system. Worse, after the government moved the District Court to (1) rescind, either in whole or in part, the referral order to the Magistrate Court and (2) set a trial date, Mr. Gogolack opposed the motion. And in a June 9, 2025, status conference before the District Court, Mr. Gogolack expressly rejected the Court's invitation to schedule

17

a trial.  The Court can and should infer from that Mr. Gogolack does not want—and has never wanted—a speedy trial.

To be sure, the government's early disclosure of 3500 material prompted Mr. Gogolack's former counsel to depart the case and new counsel to have a different briefing schedule than his co-defendants.  But an adjournment of a motions' deadline does not, in itself, amount to an adjournment of the case.  Here, Mr. Gogolack may have been given—at his counsel's request—more time to respond to dispositive motions.  However, owing to this Court's decision to set a trial date, the case, itself, has not been delayed due to the prior counsel's exit: Mr. Gogolack's scheduled trial is the same as his co-defendant's, at the earliest date Mr. Gogolack could accommodate.

Lastly, delay relating to the government's consideration of whether to seek the death penalty was welcomed by Mr. Gogolack and not squarely attributable to the government.  *See generally United States v. Aquart*, 92 F.4th 77, 97 (2d Cir. 2024) (addressing delay occasioned by the prosecution deciding whether to seek the death penalty that justified a reasonable delay in the trial, in the context of a Sixth Amendment speedy trial motion); *United States v. Abad*, 514 F.3d 271, 274 (2d Cir. 2008) ("As to the second [*Barker*] factor, there were a number of valid reasons for the delay, not least of which was the time needed for the Capital Case Unit to decide whether to seek the death penalty against [the defendants], including time for the defendants to make mitigation submissions to the Department of Justice.").  At most, the attribution for the delay is neutral.  Accordingly, the second *Barker* weighs in favor of the government.

*The Defendant's Assertion of His Right*.  Next, Mr. Gogolack claims that he has "repeatedly asserted" his right to a speedy trial.  Dkt. 690 at 11.  This is inaccurate.  After the

18

government failed to produce discovery by the May 23, 2024, deadline, Mr. Gogolack's former counsel filed an affirmation objecting to the government's motion to exclude time. *See* Dkt. 121. This single, vague objection to the exclusion of time is a far cry from the "adamant[], consistent[], and explicit[]", *United States v. Tigano*, 880 F.3d 602, 617 (2d Cir. 2018), assertion of the speedy trial right that courts have recognized as deserving of "strong evidentiary weight in determining whether the defendant is being deprived of the right," *Barker*, 407 U.S. at 531–32. *See Tigano*, 880 F.3d at 617 (concluding that the defendant personally and through counsel asserted his speedy trial right "nearly every time" he appeared before the district court); *United States v. Black*, 918 F.3d 243, 264 (2d Cir. 2019) (concluding that the defendants asserted their speedy trial rights where they repeatedly asserted their desire for a speedy trial). Certainly, the government was not put on notice that Mr. Gogolack—who had up until then sought adjournments in the case—was demanding a speedy trial when he objected to the exclusion of time. *See* Dkt. 121. Accordingly, this factor also weighs in the government's favor.

*Whether the Delay was Prejudicial to the Defendant.* Finally, the last *Barker* factor also cuts in the government's favor. For starters, even if the government was responsible for the entirety of the delay, the duration of the delay "is not sufficient to support a finding of presumed prejudice." *United States v. Palmer,* No. S114CR652PGG, 2021 WL 3932027, at *13 (S.D.N.Y. Sept. 1, 2021) (concluding the government responsible for a twenty-seven month period of delay but concluding there was no prejudice). That said, the government is only responsible for five months of constitutional speedy trial time, with the rest of the delay being neutral or attributable to Mr. Gogolack or his co-defendants. Therefore, Mr. Gogolack cannot establish the necessary prejudice to require dismissal of the Second Superseding

19

Indictment.    *See United States v. Ramos*, 420 F. Supp.2d 241, 252 (S.D.N.Y. 2006) ("Defendant's heavy reliance on presumptive prejudice would be considerably more compelling if the [g]overnment was primarily responsible for the delay, or was responsible for a greater portion of the delay. Because this [c]ourt has found that the [g]overnment is only minimally to blame for the delay, the presumption of prejudice is correspondingly weakened.").

This is especially so where Mr. Gogolack does not identify a single impairment to his defense other than his anxiety while awaiting trial.  *Barker* recognized that delay "does not per se prejudice the accused's ability to defend himself because the government bears the burden of proof when the case comes at last to trial." *Moreno*, 789 F.3d at 81 (quoting *Barker*, 407 U.S. at 521). Indeed, "fading memories often work to the accused's advantage." *Id.* (citing *Barker*, 407 U.S. at 521, 92 S. Ct. 2182; *see also Brillon*, 556 U.S. at 90).  Here, Mr. Gogolack cannot show that his defense was impaired to any degree.

In sum, "all four factors must be considered together with such other circumstances as may be relevant." *United States v. Cabral*, 979 F.3d 150, 157 (2d Cir. 2020) (internal quotation marks and citations omitted).  With those four factors in mind, "if the government pursues a defendant with reasonable diligence, the Sixth Amendment claim fails however great the delay unless the defendant can show specific prejudice to his defense." *Id.*  Here, on balance, the *Barker* factors do not weigh in favor of dismissal.  Accordingly, the Court should deny Mr. Gogolack's motion to dismiss based on the Sixth Amendment Speedy Trial claim.

## II.    Mr. Gogolack's *Brady* Motion Should Be Denied.

Mr. Gogolack next moves this Court for the following:

1.  A complete unredacted copy of any grand jury testimony related to ████████████ and/or ████████████████████ as it pertains to this case;

2.  Any and all investigative files regarding ████████████ and ████████████████████;

3.  DA investigative files pertaining to ████████████ or ████████ ████████████;

4.  U.S. Attorney's Office investigative files on ████████████ and ████████████████████; and

5.  Any and all material not otherwise listed, including internal files related to any *Brady* material involving ████████████ or ████████████████████.

Dkt. 690 at 13.

This motion should be denied. First, the government is aware of its *Brady* obligations and has liberally disclosed early 3500 material to the defendants. The disclosure of additional 3500 material would be premature prior to the full adjudication of Mr. Gogolack's pending motions to dismiss. The government will produce additional 3500 material in accordance with the Court's Trial Order.

Second, Mr. Gogolack's request for "all" the investigative files regarding ████████ ████ and ████████████ reaches far past the confines of *Brady*. *Brady* compels the production of only those files containing "evidence favorable to [the] accused." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). And even then, that obligation attaches only to the prosecution team, whose constructive knowledge of potentially favorable evidence to the defense "does not encompass every agency and individual within the federal government," let alone the state government that Mr. Gogolack's motion targets. *United States v. Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013) (citing *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)). Nor does *Brady* require the prosecution team to penetrate the case files of colleagues who may have information about a person of interest to a defendant, *see United*

21

*States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are not involved in the investigation." (quoting *Meregildo*, 920 F.Supp.2d at 441)), or seek out files that it does not have, *see United States v. Bradley*, 105 F. 4th 26 (2d Cir. 2024).  And, in any event, Mr. Gogolack cites no specific information to establish his suspicion that other materials in the U.S. Attorney's Office's possession contain *Brady* information.  Accordingly, Mr. Gogolack's motion to compel should be denied.

### III.    The Court Should Deny Mr. Gogolack's Motion for the Disclosure of Grand Jury Minutes.

Mr. Gogolack also seeks the disclosure of grand jury minutes, arguing that the indictment's allegation that he faked his own overdose is demonstrably false.  *See* Dkt. 690 at 13 ¶ 54 – 15 ¶ 57.  Mr. Gogolack claims that short of being misled by the government, the grand jury would not have been able to make this finding.  *See id.*  Because Mr. Gogolack's claims fail to satisfy the particularized need test and are contravened by the discovery, his motion should be denied.

### A.    Factual Background

On August 1, 2023, B▮▮▮ K▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮, called 911 to report an overdose at Mr. Gogolack's residence located at 296 Scott Avenue, Wellsville, New York.  *See* Dkt. 690, Ex. B at 1.  According to ▮▮▮▮, Mr. Gogolack was in his yard, unresponsive.  *Id.* at 2.  When emergency medical personnel arrived on the scene, however, they found Mr. Gogolack to be "awake" and "alert."  *See* Dkt. 690, Ex. C at 2.  In fact, when evaluating Mr. Gogolack's level of consciousness, EMTs scored him at a 14 out of 15 on the Glasgow Coma Scale.  *See id.*; *see also* *Glasgow Coma Scale*, https://my.clevelandclinic.org/health/diagnostics/24848-glasgow-coma-scale-gcs,    (last

22

accessed Dec. 23, 2025) ("The highest possible GCS score is 15, and the lowest is 3. A score of 15 means you're fully awake, responsive and have no problems with thinking ability or memory.").

Mr. Gogolack admitted to drinking heavily and smoking marijuana, and then to, purportedly, taking a "Xanax," *id.*, the very kind of substance he claimed Ms. Quinn took prior to dying, *see* FBI 302, Int. Simon Gogolack, GOV-00009692, (dated Aug. 2, 2023). Subsequently, emergency personnel transported him to Jones Memorial Hospital, where he was further evaluated. *See generally* Dkt. 690, Ex. D. At the hospital, Mr. Gogolack was alternating "unresponsive" and "waxing and waning with his mental status." *Id.* at 4–5. Medical personnel administered 1 dose of Narcan without any response. *See id.* at 5.

Nevertheless, Mr. Gogolack, himself, admitted to faking his past overdoses. Specifically, in a November 1, 2023, recorded jail call between him and former co-defendant Cortnie Barber, Mr. Gogolack stated that he had faked an overdose on at least two occasions. *See* Exhibit B-1, (Nov. 1, 2023, Gogolack Jail Call).[1]

### B.    Legal Framework

"It is axiomatic that 'grand jury proceedings are accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.'" *United States v. Basciano*, 763 F. Supp. 2d 303, 315 (E.D.N.Y. 2011) (quoting *United States v. Tranquillo*, 606 F. Supp. 2d 370, 381 (S.D.N.Y. 2009)). "[T]o overcome the presumption of regularity that attaches to a grand jury proceeding, the defendant, who bears the burden of persuasion, must present particularized proof of an" impropriety. *United States*

---

[1] Exhibit B-1 is an 11-minute recorded jail call. Mr. Gogolack's comments concerning his past, fraudulent overdoses are shared between 2:20 to 3:30 minutes into the call.

*v. Calk*, 87 F. 4th 164, 186 (2d Cir. 2023) (internal quotations omitted)).  The Supreme Court

has formulated a three-factor test to this effect.  Specifically:

> Parties seeking grand jury transcripts under Rule 6(e) must show (1) that the material they seek is needed to avoid a possible injustice in another judicial proceeding, (2) that the need for disclosure is greater than the need for continued secrecy, and (3) that their request is structured to cover only material so needed.

*Douglas Oil Co.*, 411 U.S. at 222 (enumeration added).

Regarding the second factor, maintaining the secrecy of grand jury proceedings is a

tradition in the United States that predates the birth of the nation itself.  *In re Petition of Craig*,

131 F.3d 99, 101 (2d Cir. 1997) (citing *In re Biaggi*, 478 F.2d 489, 491 (2d Cir. 1973)).  Federal

Rule of Criminal Procedure 6(e) codifies the rule of secrecy, which has multiple purposes,

including:

> (1) [t]o prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; [and] (5) to protect [the] innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Id.* at 102 (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681–82 n.6 (1958)).

It is well settled that "[h]ope and speculation are wholly insufficient to overcome the

rule of secrecy in grand jury proceedings that is embodied in Fed. R. Crim. P. 6(e)."  *United*

*States v. Smith*, 105 F. Supp. 3d 255, 261 (W.D.N.Y. 2015) (Wolford, J.); *see also United States*

*v. Cobb*, 544 F. Supp. 3d 310, 332 (W.D.N.Y. 2021) (same).  "A review of grand jury minutes

is rarely permitted without specific factual allegations of government misconduct," and Rule

24

6(e)(3)(E)(ii) expressly contemplates that such misconduct sufficiently serve as a basis upon which the indictment "may" be dismissed. *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010); Fed. R. Crim. P. 6(e)(3)(E)(ii); *see also United States v. Dunn*, No. 05 Cr. 127, 2005 WL 1705303, at *3 (S.D.N.Y. July 19, 2005) ("[G]eneral and unsubstantiated assertions are insufficient to meet the stringent standard that a party must show a particularized need for such materials." (quotation and modification omitted)); *United States v. Ferrara*, 990 F. Supp. 146, 153 (E.D.N.Y.1998) ("The strong presumption of regularity in grand jury proceedings cannot be outweighed by purely conclusory or speculative allegations of misconduct.").

"This standard applies equally to a defendant's request for the court to conduct *in camera* inspection of grand jury transcripts." *Smith*, 105 F. Supp. 2d at 261; *United States v. Forde*, 740 F. Supp. 2d 406, 413–14 (S.D.N.Y. 2010) (applying particularized need standard to the defendant's request for an *in camera* inspection of the grand jury minutes); *United States v. Crisona*, 271 F. Supp. 150, 158–59 (S.D.N.Y. 1967) (mere speculation regarding potential irregularities did not require a trial judge to inspect grand jury minutes).

### C.   Analysis

Mr. Gogolack's motion for disclosure should be denied for two reasons. First, the discovery substantiates the grand jury's finding that Mr. Gogolack faked his overdose. *See* Dkt. 24 at 22 ¶ 54 ("On or about August 1, 2023, after members of the Wellsville Police Department and the Allegany County Coroner left Gogolack's residence, Gogolack faked his own overdose and went to a local hospital."). Specifically, to say nothing of the other evidence of Mr. Gogolack's fraudulent conduct, his own admission that he faked an overdose on multiple occasions is strong evidence that Mr. Gogolack faked his overdose as alleged.

25

Second, Mr. Gogolack's motion "is not really challenging the specificity of the Indictment so much as the adequacy of the evidence upon which the Indictment is based." *United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997). The government is not required, however, to "demonstrate the sufficiency of its proof until the close of its case-in-chief at trial." *Id.*; *cf. United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998) ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."). And though Mr. Gogolack—like his co-defendants—attempts to circumvent this elementary principle by cloaking his challenges to the indictment's evidentiary sufficiency in the garb of prosecutorial misconduct, longstanding Supreme Court precedent rejects this tactic: "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed," as defendants "could always insist on a kind of preliminary trial" targeting the government's grand jury presentation. *Costello v. United States*, 350 U.S. 359, 408 (1956); *see United States v. Forde*, No. 1:18-CR-00339-PAC-5, 2020 WL 4288281, at *2 (S.D.N.Y. July 27, 2020) ("The motion repeatedly asserts that the evidence of Forde's intent to join the conspiracy is lacking, and otherwise argues that 'if these factually false claims were so presented to the grand jury . . . the indictment was improperly obtained, and must be dismissed.' This is all what *Costello* explicitly disallows." (internal citations omitted)). Accordingly, Mr. Gogolack's sufficiency-laden challenges to the indictment cannot, as a matter of law, satisfy the "particularized need" standard and his motion for disclosure should be denied.

### IV.  The Court Should Deny Mr. Gogolack's Motion for Disclosure and Severance.

Mr. Gogolack next moves for the disclosure of "any statements attributable to any one of the defendants whether made by the defendants to a police agency or whether it will be

alleged that any of the defendants made statements to any other person." Dkt. 690 at 16 ¶ 62. Mr. Gogolack requests these materials so that "he can more intelligently file a motion to sever Mr. Gogolack's trial from that of any other Defendant's trial." *Id.*

Mr. Gogolack's motion for disclosure should be denied, as many of the defendants' statements have already been disclosed in discovery.[2]  Thus, Mr. Gogolack already has in his possession most co-defendant statements in this case such that he can intelligently file a motion to sever.  In the same vein, Mr. Gogolack's motion for severance should be denied without prejudice as unripe because he has failed to proffer exemplars of statements that he believes merit severance or why they require severance under Rule 14.  *See United States v. Altorei*, No. 23-CR-407-LTS, 2025 WL 2381589, at *7 (S.D.N.Y. Aug. 15, 2025) (concluding that "[d]efendants' request for severance [was] . . . largely speculative and not ripe for adjudication" where defendants failed to offer exemplars of statements they thought required severance).

### V.    The Court Should Deny Mr. Gogolack's Motion to Dismiss Due to Purported Multiplicity.

Mr. Gogolack next seeks to dismiss Counts 13 through 18 as multiplicitous. Gogolack Disp. Mots., at 17–18 ¶¶ 68–73.  Mr. Gogolack claims that "Counts 13 through 15 charge Mr. Gogolack with violating 18 U.S.C. § 1512([b])(1) for allegedly tampering with Victim 1, a witness, on August 14, 2023," and thus "charge the exact same conduct and do not set forth any factual allegations that differentiate between the conduct alleged in each count." *Id.* at 18 ¶ 70.  In Mr. Gogolack's view, Counts 16 through 18, which charge witness tampering against Victim 2, suffer the same defect. *See id.* at ¶ 71.

---

[2] The government previously provided redacted versions of FBI 302s of co-defendant Howard Hinkle's proffers. The government intends to disclose unredacted versions of those 302s in the near future.

Mr. Gogolack's central premise—that all the counts in question charge witness tampering under § 1512(b)(1)—is incorrect. Those counts charge Mr. Gogolack with committing witness tampering against Victims 1 and 2, as follows:

| Counts 13 – 18 Charge Table | | | |
|---|---|---|---|
| Count No. | Victim No. | Charge | Citation (Dkt. 24) |
| 13 | Victim 1 | 18 U.S.C. § 1512(b)(1) | 40 |
| 14 | Victim 1 | 18 U.S.C. § 1512(b)(2)(A) | 40–41 |
| 15 | Victim 1 | 18 U.S.C. § 1512(b)(3) | 41 |
| 16 | Victim 2 | 18 U.S.C. § 1512(b)(1) | 41–42 |
| 17 | Victim 2 | 18 U.S.C. § 1512(b)(2)(A) | 42 |
| 18 | Victim 2 | 18 U.S.C. § 1512(b)(3) | 42–43 |

Each offense connected to Victim 1 (Counts 13–15) contains different elements and, thus, reflects a distinct crime. *Compare* 18 U.S.C. § 1512(b)(1) (referring to acts done with the intent to "influence, delay, or prevent the testimony any person in an official proceeding"), *with* § 1512(b)(2)(A) (referring to acts done with the intent to "cause or induce any person to [ ] withhold testimony or withhold a record, document or other object from an official proceeding") *and* § 1512(b)(3) (referring to acts done with the intent to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings"). The same is true as to the Victim 2 Counts—*viz.*, Counts 16 through 18.

That each set of counts charges crimes with distinct elements defeats Mr. Gogolack's multiplicity claim. *See United States v. Chacko*, 169 F.3d 140, 146 (2d Cir. 1999) ("To assess whether the two offenses charged separately in the indictment are really one offense charged twice, the "same elements" test or the "*Blockburger* " test is applied."). Accordingly, Mr. Gogolack's motion should be denied.

28

**VI.    The Court Should Deny Mr. Gogolack's Motion to Dismiss Due to Purported Facial Insufficiency.**

Lastly, Mr. Gogolack moves to dismiss Count 10, which charges him with being an unlawful user of controlled substances in possession of a firearm and ammunition between July 21, 2023, and August 8, 2023, in violation 18 U.S.C. § 922(g)(3).  *See* Dkt. 690 at 18–19 ¶¶ 74–78; Dkt. 24 at 38.  According to Mr. Gogolack this count is facially insufficient because it alleges that Mr. Gogolack "was" an unlawful user of controlled substances, whereas the statute uses the word "is."  *Compare* Dkt. 24 at 38 ("Between on or about July 21, 2023, and on or about August 8, 2023, the exact dates being unknown to the Grand Jury, in the Western District of New York, the defendant, SIMON GOGOLACK, knowing that he *was* an unlawful user of controlled substances as defined in Title 21, United States Code, Section 802, did knowingly possess in and affecting commerce, a firearm . . . ." (emphasis added)), *with* 18 U.S.C. § 922(g)(3) ("It shall be unlawful for any person . . . who *is* an unlawful user of or addicted to any controlled substance . . . to . . . possess in or affecting commerce[] any firearm or ammunition" (emphasis added)).  In Mr. Gogolack's view, Count 10's "use[] of the word 'was' . . . did not convey to the grand jury § 922(g)(3)('s requirement that the use of the controlled substances had to be contemporaneous with possession of the firearm and ammunition.").  Dkt. 690 at 19 ¶ 77.  This motion should be denied because the indictment tracks the statutory language and specifies that Mr. Gogolack's possession of a firearm and use of controlled substances occurred during the period charged—i.e., between July 21, 2023, and August 8, 2023.

Rule 7 of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  An indictment satisfies this rule if it "first, contains the

elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974) (internal quotation marks and citations omitted)). Here, Count 10 plainly tracks the elements contained in § 922(g)(3) and, therefore, is facially sufficient for the purposes of Rule 7(c).

Furthermore, Mr. Gogolack's argument regarding Count 10's use of the word "was" is misplaced. Specifically, the indictment's use of the word "was" is "nothing more than a reconciliation of a statute worded in the present tense and the fact that a charging document must be worded in the past tense," because charges always relate to past conduct. *United States v. Kettles*, No. 3:16-00163-1, 2017 WL 3425162, at *2 (M.D. Tenn. Aug. 9, 2017), *aff'd*, 970 F.3d 637 (6th Cir. 2020). Moreover, the Court's jury instructions will specify that the government bears the burden of demonstrating that Mr. Gogolack used controlled substances during the period he possessed the firearms. *See United States v. Mack*, 343 F.3d 929, 933 (8th Cir. 2003) (explaining that the government must "demonstrate that [the defendant] *was* a 'user of any controlled substance' during the period of time he possessed the firearms" (emphasis added and quoting 18 U.S.C. § 922(g)(3))). As such, Mr. Gogolack's motion to dismiss the indictment should be denied.

### VII.    The Court Should Deny Mr. Gogolack's Motion to Suppress Statements.

Mr. Gogolack moves to suppress any statements he made to law enforcement. *See* Dkt. 690, at ¶¶ 79–84. Mr. Gogolack moves to suppress the statements because he claims that (i) the statements were the result of an unlawful detention; (ii) the statements were the product of custodial interrogation without Miranda warnings; and (iii) the statements were made in violation of his right to counsel. *Id.* at ¶ 81. Mr. Gogolack did not file an affidavit disputing

material issues of fact as to any of the statements he made to law enforcement. *Id.* The government believes that the motion should be denied for the reasons that follow.

### A.    Relevant Background

On August 1, 2023, at 2:53 p.m., Mr. Gogolack called 911, said nothing, and hung up the phone. *See* Exhibit C, GOV-00027052 & GOV-00027054.[3] Nearly three-and-a-half hours later, at 6:23 p.m., Mr. Gogolack again called 911, reporting that "this girl that gave me and my buddy a ride home last night" was "not even responsive" inside of his home and that she was cold to the touch and not breathing. *See* Exhibit D, GOV-00009687 & GOV-00030640.[4] Members of the Wellsville Village Police Department and (eventually) the Allegany County Coroner responded to Mr. Gogolack's home at 296 Scott Avenue in response to his 911 call. *See* Exhibit E, GOV-00026999.[5]

As documented in Exhibit E, Mr. Gogolack made various statements to law enforcement while they were present at his home, responding to his 911 call. Mr. Gogolack was present in his own home and was not in custody at that time. At some point after providing information to law enforcement, Mr. Gogolack was asked to sign a deposition regarding the information that he had provided, at which point Mr. Gogolack stated, in sum and substance, that he should speak to an attorney because he didn't want the police to "twist his words." *See* Exhibit E. After making that statement, Mr. Gogolack went on to "ask[ ]

---

[3] Exhibit C, provided to the Court and defense counsel separately and requested to be filed under seal, consists of the recording of Mr. Gogolack's first 911 call (GOV-00027052) and the report of Mr. Gogolack's first 911 call (GOV-00027054).

[4] Exhibit D, provided to the Court and defense counsel separately and requested to be filed under seal, consists of the recording of Mr. Gogolack's second 911 call (GOV-00009687) and the report of Mr. Gogolack's second 911 call (GOV-00030640).

[5] Exhibit E, provided to the Court and defense counsel separately and requested to be filed under seal, consists of the Wellsville PD Incident Report documenting the law enforcement response to that 911 call (GOV-00026999). Also being produced are the FBI 302 report documenting the interviews of Sgt. Fanton, GOV-00027082, *see* Exhibit E-1; Officer Louis Pettit, GOV-00027085, Exhibit E-2; and PO Valentine, GOV-00027079, Exhibit E-3.

approximately 10 – 15 times to make sure the cause of death is found out" and continued to make "several unsolicited statements" to the police including "I'll be the suspect if that's what's needed to find out what happened to her." *Id.*

When the Coroner arrived, Mr. Gogolack made statements to him as well, indicating that Ms. Quinn was his "side-piece", that he had spoke with Ms. Quinn the day before [her death], that he had thought Ms. Quinn was sleeping on the day he found her deceased, and that he had been "in and out" during the day. *See* Exhibit F, GOV-00010692.[6]  Mr. Gogolack told the Coroner that Ms. Quinn "was going to trial and had been under a lot of stress" and that Ms. Quinn was going to "end it all" and then clarifying that Ms. Quinn had indicated that she was going to kill herself. *Id.*

The next day, August 2, 2023, at about 4:03 p.m., Police Officer Wojciechowicz of the Depew Police Department was notified by the FBI that they expected Mr. Gogolack to be arriving in a vehicle near the vicinity of Donna Court and requested his assistance conducting a traffic stop of that vehicle. *See* Exhibit G, GOV-00029150.[7]  PO Wojciechowicz, in response to that request, checked a law enforcement database and learned that Mr. Gogolack's New York State Driver's License was presently revoked. *Id.*  PO Wojciechowicz also looked up booking photographs of Mr. Gogolack so that he would be familiar with Mr. Gogolack's appearance. *Id.*  Around 7:05 p.m., PO Wojciechowicz observed Mr. Gogolack driving a black 2008 Honda Accord in the vicinity of Donna Court in Depew, New York, and initiated a traffic stop of his vehicle. *Id.*  At around 7:10 p.m., PO Wojciechowicz placed Mr. Gogolack

---

[6] Exhibit F, provided to the Court and defense counsel separately and requested to be filed under seal, consists of the FBI 302 report documenting an interview of the Allegany County Coroner (GOV-00010692).

[7] Exhibit G, provided to the Court and defense counsel separately and requested to be filed under seal, consists of the Depew Police Department Complaint Report documenting the arrest of Simon Gogolack on August 2, 2023 (GOV-00029150).

under arrest for a violation of New York State Vehicle and Traffic Law § 511 (Aggravated Unlicensed Operation of a Motor Vehicle). PO Wojciechowicz's then transported Mr. Gogolack to the Depew Police Department. *Id.* PO Wojciechowicz's interactions with Mr. Gogolack are recorded on his body worn camera. *See* Exhibit H.[8] Mr. Gogolack makes numerous statements to PO Wojciechowicz during the traffic stop and while he is being transported to the Depew P.D. stationhouse. It appears from the body-worn camera video that Mr. Gogolack initiates that discussion. It is apparent that PO Wojciechowicz was not "interrogating" Mr. Gogolack for the purposes of *Miranda*, but merely entertaining Mr. Gogolack's unsolicited comments.

At around 9:32 p.m.[9], FBI Special Agent (SA) Adam Penna and SA Jason Kammeraad meet Mr. Gogolack at the Depew Police Department and bring him to an interview room. *Id.* The interactions between the FBI agents and Mr. Gogolack in the interview room at the Depew Police Department are video/audio recorded. See Exhibit I.[10] A draft transcript of the audio recording from "Interview Room 1" was generated by the FBI. See Exhibit J.[11] At the outset of the interview, FBI SA Penna and SA Kammeraad advise

---

[8] Exhibit H, provided to the Court and defense counsel separately and requested to be filed under seal, consists of two video files of PO Wojciechowicz's body-worn camera footage from August 2, 2023. Those recordings were produced natively in discovery and are therefore not bates-numbered.

[9] This reference to the time is from bottom of the video recording of the interview, not the timestamp in the top-left corner of the screen. The two timestamps are approximately 14 minutes apart, but the government believes the bottom timestamps, associated with the video-player, to be accurate based upon the time referenced in PO Wojciechowicz's report (indicating that Gogolack was mirandized at 9:30 pm).

[10] Exhibit I, provided to the Court and defense counsel separately and requested to be filed under seal, consists of video from the Depew Police Department documenting the FBI's recorded interview with Mr. Gogolack. Those recordings were produced natively in discovery and are therefore not bates-numbered. To play the video, first open the "AXIS" file player (also produced) and the video should automatically load.

The FBI 302 documenting the interview of Mr. Gogolack is being produced as Exhibit I-1. Exhibit I-1 was previously produced in bates-numbered discovery as GOV-00009692.

[11] Exhibit J, provided to the Court and defense counsel separately and requested to be filed under seal, consists of a draft transcript of the audio recording of the FBI interview of Mr. Gogolack on August 2, 2023. This draft transcript is subject to the limitations of the audio quality and the government requests that the Court use it as an aid in viewing the recording itself, which is the best evidence.

33

Mr. Gogolack that he is in the custody of the Depew Police Department, and that they do not want to speak with him about that arrest. *See* Exhibits I and J. Mr. Gogolack responds that "I understand that it's just, uhm, uh, driving without a license, uhm…driving on revoked. And I know that I am not, uhm, not obligated here to talk to you. *I want to*." *Id*. FBI SA Penna and SA Kammeraad then advise Mr. Gogolack that (i) he has the right to remain silent; (ii) that anything he says can and will be used against him in a court of law; (iii) that he has the right to an attorney; (iv) that if he cannot afford an attorney, one will be provided for him; and (v) that he has the right to stop answering any questions whenever he wants to. *Id*. Mr. Gogolack is asked if he has any questions [about those rights] and Mr. Gogolack shakes his head and responds "no". *See* Exhibit I at 21:34:17 to 21:34:22.[12] [13] SA Kammeraad begins the interview by stating "I'm just gonna go off of what you've already told me. That's it. You know what I mean?"[14] The agents also advise Mr. Gogolack that some of their questions will be based off of what they learned from speaking with Ms. Quinn's mother. *Id*.

Mr. Gogolack proceeds to have a conversation with the agents until approximately 21:50:52, when Mr. Gogolack states "Uhm…alright…I'm here, I'm just saying 'lawyer', but I'll answer your questions." That causes the following exchange to take place, as depicted in Exhibit I and J[15]:

---

[12] In Exhibit J, the transcript, Mr. Gogolack's response is documented as "UI" for unintelligible. It is apparent to the undersigned upon review of Exhibit I, the recording, that Mr. Gogolack responds "no" while shaking his head from side to side in the universal gesture for "no."

[13] Citations to time (such as 21:34:17) are references to the timestamp for the time listed in the video player, found at the bottom of the video player, not the time-stamp at the top-left corner of the screen.

[14] Upon information and belief, this comment by SA Kammeraad is in reference to a brief interaction he had with Mr. Gogolack when Mr. Gogolack was in the Depew PD police vehicle. Upon information and belief, after introducing himself to Mr. Gogolack, SA Kammeraad asked Mr. Gogolack about how and when he came into possession of Sharon Quinn's vehicle. Upon information and belief, Mr. Gogolack had not yet been *Mirandized* at the time SA Kammeraad engaged in that brief discussion with Mr. Gogolack.

[15] The undersigned believes there to be an error in the transcript the government is providing to the Court. In the first text attributable to Mr. Gogolack (SG) at the top of the page, where the transcript reads "I'm not speaking to attorneys, so I just I'll answer all your shit though, so keep…you can keep going." The undersigned believes that Mr. Gogolack states "I wanna speak to an attorney, so I just I'll answer all your shit though, so keep…you can keep

34



going." The audio is admittedly "staticky" and the undersigned did not recognize this potential error in the transcript until preparing this motion response.





37



The agents leave the room at approximately 21:55:00. *Id.* At approximately 22:32:42, the agents re-enter the room and provide Mr. Gogolack with a paper copy of a search warrant they obtained for his cell phone – advising him "don't say anything right now, just listen to

38

what I've gotta say, alright, because you've been helpful, but you're mixing words a little bit, right? Do you have a lawyer, is there someone you want us to call for you?" *Id.* Mr. Gogolack appears to shake his head no in response to that question. SA Penna then asks "Do you want us to find a lawyer for you? Because you were being super helpful, then you said, like, 'lawyer, I don't wanna incriminate myself', and we take that stuff seriously."

Mr. Gogolack responds but his response is unintelligible. *Id.* SA Penna then indicates "If there's someone you want us to call, we'll call." Mr. Gogolack responds by referencing the search warrant "So what is this, uh, so what's this?" SA Penna advises him "This is a search warrant. We're taking just the phone, not you. You're good man, you're still leaving tonight." Mr. Gogolack responds "Cool, yeah, that's no problem. And if there's anything I can seriously help you with." *Id.*

SA Penna responds "We're gonna look through here and we're gonna see everything on here, okay?" and Mr. Gogolack replies "Yeah, I guess." SA Penna then states "Cause cause again, we just wanna find out where she was going. What she was doing. Alright..." and Mr. Gogolack replies "We were together. We were just together, she's getting away, and that was it." SA Penna then confirms with Mr. Gogolack "Okay, so you don't, you don't want a lawyer? Can can we keep talking about this or?" and Mr. Gogolack replies "Yes, that's fine with me." *Id.* SA Penna reconfirms "Okay. That's okay with you?" Mr. Gogolack replies "Well is this holding this shit up...I got...is this holding this shit up?" and SA Penna replies "We gotta call your...we gotta call your dad and see what (UI) but" at which point Mr. Gogolack interjects "I had the courage to come forward." SA Kammeraad then responds "You were. Okay. You are done here, with Depew." Mr. Gogolack states "I'm already under arrest with Depew the whole time." SA Kammeraad responds "Yes I

39

know that, but we're telling you, like, if you wanna leave right now, you can." Mr. Gogolack responds "Okay, yeah. If you have things you want to get at, let's just get through it." SA Kammeraad responds "I would love to." Mr. Gogolack replies "Yeah, let's do it." SA Kammeraad again reconfirms "If you're good with it." Mr. Gogolack responds "I'm cool with it." SA Kammeraad asks again "So you don't have anybody you want us to call right now?" and Mr. Gogolack replies "No, no." SA Kammeraad then responds "Okay. Do you want us to find a lawyer for you right now, before we finish up?" Mr. Gogolack responds "No, I." SA Kammeraad advises him "Alright, if, if that changes" and Mr. Gogolack interjects "Yeah" and SA Kammeraad continues "Just let us [know]". The interview of Mr. Gogolack then continues beginning at about 22:34:53. *Id.*

Mr. Gogolack voluntarily continues to provide information to agents. Id. At approximately 22:55:48, the agents begin to confront Mr. Gogolack with the possibility that he is withholding information from them and Mr. Gogolack becomes agitated. At approximately 22:56:27, after SA Kammeraad told Mr. Gogolack that he did not believe Mr. Gogolack was being truthful, Mr. Gogolack responded "Fuck you, lawyer." SA Kammeraad advised Mr. Gogolack "you're free to leave, but I don't think you're helping out." Mr. Gogolack replies "You don't think I'm fucking helping out, I can guarantee you that girl didn't touch any fucking thing, I can guarantee it. Fuck you guys. Go fuck yourselves. Fuck you. Go fuck yourselves." As he states this, Mr. Gogolack gets up and leaves the room of his own volition, continuing to call back at the agents as he leaves. *Id.* This concludes the agents' interview of Mr. Gogolack on August 2, 2023 at the Depew Police Department. *Id.* Mr. Gogolack was ultimately arrested by the FBI on August 23, 2023, three weeks after the interview.

40

Mr. Gogolack has not, to date, provided any affidavit disputing material issues of fact in relation to the statements he made to law enforcement.

### B.     Legal Framework

### 1.     August 2, 2023, Traffic Stop and Depew PD Arrest

A person is guilty of the offense of aggravated unlicensed operation of a motor vehicle in the second degree when such person commits the offense of aggravated unlicensed operation of a motor vehicle in the third degree as defined in subdivision one of this section; and the suspension or revocation is based upon a refusal to submit to a chemical test pursuant to section eleven hundred ninety-four of this chapter, a finding of driving after having consumed alcohol in violation of section eleven hundred ninety-two-a of this chapter or upon a conviction for a violation of any of the provisions of section eleven hundred ninety-two of this chapter. *See* New York State Vehicle and Traffic Law, Section 511(2)(a)(ii). This offense is an unclassified misdemeanor under New York State law. *Id.*

Except while operating a motor vehicle during the course of a road test conducted pursuant to the provisions of this article, no person shall operate or drive a motor vehicle upon a public highway of this state or upon any sidewalk or to or from any lot adjacent to a public garage, supermarket, shopping center or car washing establishment or to or from or into a public garage or car washing establishment unless he is duly licensed pursuant to the provisions of this chapter. *See* New York State Vehicle and Traffic Law, Section 509-01. This offense is an infraction under New York State law. *Id.*

No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately

41

to the rear when there is opportunity to give such signal. *See* New York State Vehicle and Traffic Law, Section 1163-C. This offense is an infraction under New York State law. *Id.*

### 2.    Miranda Warnings – Custody and Interrogation

For the *Miranda* advice-of-rights requirements to be triggered, the defendant must be subjected to "custodial interrogation." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). Warnings are not required where "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present." *Id.* In determining whether a defendant is in custody for *Miranda* purposes, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (issue is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."). "This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992). Absent a formal arrest, courts "rarely conclude" that a suspect questioned at home is in custody for *Miranda* purposes. *United States v. Faux*, 828 F.3d 130, 135-36 (2d Cir. 2016) (suspect was not in custody when questioned at home for two hours while agents executed search warrant where she was told she was not under arrest, questioning was "largely conversational," and agents did not show firearms or make threats.) The police do not place a suspect in custody by forbidding entry to a specific location, where the suspect is otherwise free to come and go. *See United States v. Kirsh*, 54 F.3d 1062, 1068 (2d Cir. 1995).

The term "interrogation" includes express questioning of the suspect and its "functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably

42

likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Whether interrogation has occurred does not turn on the subjective intent of the police; the relevant test looks at "the perspective of the suspect." *Perkins*, 496 U.S. at 296. Questioning of non-government agents is not interrogation. *See United States v. Romero*, 897 F.2d 47, 52–53 (2d Cir. 1990) (statement to emergency room nurse not product of interrogation). However, questioning by government agents who are not law enforcement officers *may* constitute interrogation where there is a "possibility," of which the agents is aware, that the investigation could lead to criminal prosecution. *See Mathis v. United States*, 391 U.S. 1, at 4 (1968) (questioning by IRS agent involved in civil litigation was interrogation because tax investigations frequently lead to criminal prosecutions); *and Jackson v. Conway*, 763 F.3d 115, 138–140 (2d Cir. 2014) (questioning by Child Protective Services worker about the sexual abuse of a child was interrogation because the interviewer would have been mandated to report inculpatory statements to law enforcement for potential use in prosecution); *but see also United States v. Rodriguez*, 356 F.3d 254, 259 (2d Cir. 2004) (no interrogation where interview conducted by INS agent solely to determine whether defendant was subject to deportation, where INS agent was not aware that information that he elicited could be the basis for criminal prosecution).

*Miranda* requires that the police inform a defendant, before questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). A precise recitation of the language of the *Miranda* opinion is not

43

required, so long as the warnings given adequately convey the substance of these rights to the defendant. *California v. Prysock*, 453 U.S. 355, 359–61 (1981).

A defendant challenging the voluntariness of a confession has the right to "a fair hearing and a reliable determination on the issue of voluntariness." *Jackson v. Denno*, 378 U.S. 368, 377 (1964). The issue is whether the conduct of law enforcement officials "was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); see also *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988) ("Is the confession the product of an essentially free and unconstrained choice by its maker?"). The voluntariness of a statement made by a defendant must be assessed based upon the totality of the circumstances. *See United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990). The prosecution bears the burden of showing voluntariness. *See Colorado v. Connelly*, 479 U.S. 157, 168–69. The inquiry centers around "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green* 850 F.2d at 900.

Historically, the principal cases in which coercion has been found have involved truly outrageous conduct by the police, such as beating the defendant, *see Brown v. Mississippi*, 297 U.S. 278 (1936); administration of a "truth serum," *see Townsend v. Sain*, 372 U.S. 293 (1963); depriving the defendant of food and holding him in a "sweat box," *see Brooks v. Florida*, 389 U.S. 413 (1967); threatening to take the defendant's ailing wife into custody, *see Rogers*, 365 U.S. at 534; or to deprive the defendant of her welfare benefits and custody of her children, *see Lynumn v. Illinois,* 372 U.S. 528 (1963). More recently, the Second Circuit found government conduct sufficiently coercive to render a confession involuntary in situations such as continuing to question a suspect who was actively overdosing on drugs, *see United States v.*

44

*Taylor*, 745 F.3d 15, 25 (2d Cir. 2014); where a suspect was told that if he asked for a lawyer he would be prohibited from cooperating with the government, *see United States v. Anderson*, 929 F.2d 96, 100–02 (2d. Cir. 1991); or where a prosecutor told a suspect, accurately though unrealistically, that he faced "a possible sentence of a hundred years.", *see United States v. Duvall*, 537 F.2d 15, 25 (2d Cir. 1976).

3.      <u>Miranda – Right to Counsel and Invocation</u>

To invoke the Miranda right to an attorney, the suspect must make "some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). "A reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel" does not require the police to cease questioning. *Davis v. United States*, 512 U.S. 452, 459 (1994). The Supreme Court, in *Davis* went on to state

> When the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity' because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in *Edwards* requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer.

*Id.* (quoting *Michigan v. Mosley*, 423 U.S. 96, 102 (1975)). The Second Circuit has held that courts must "[r]esolve any doubts in favor of the conclusion that the suspect did not intend any waiver of his right to consult counsel." *United States v. Quiroz*, 13 F.3d 505, 511 (2d Cir. 1993).

The Second Circuit has held that the following statements are insufficient to constitute an unambiguous request for counsel: "Maybe I should talk to a lawyer," *Davis*, 512 U.S. at 462; a statement that the suspect had an attorney in another case coupled with a refusal to

45

sign an advice-of-rights form, *see United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012); "I am not sure if I should be talking to you" and "I don't know if I need a lawyer" coupled with a refusal to sign a waiver form, *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011); "Do you think I need a lawyer?" *Diaz v. Senkowski*, 76 F.3d 61, 64–65 (2d Cir. 1996); and a suspect's statement that he "was going to get a lawyer" without requesting one, *United States v. Scarpa*, 897 F.2d 63, 69–70 (2d Cir. 1990). *But see Wood v. Ercole*, 644 F.3d 83, 91–92 (2d Cir. 2011) ("I think I should get a lawyer" was unambiguous request for counsel).

Relatedly, an attorney's filing of a notice of appearance in an immigration matter did not constitute an invocation of the right to counsel in a related criminal case. *See United States v. Thompson*, 35 F.3d 100, 105–06 (2d Cir. 1994). Likewise, a juvenile's request to see his probation officer did not invoke his Miranda right to counsel. *See Fare v. Michael C.*, 442 U.S. 707, 722 (1979). On the other hand, once a suspect clearly invokes the right to counsel, post-request responses to further interrogation may not be used "to cast doubt on the adequacy of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 98–99 (1984) (suspect clearly requested counsel even though he indicated only moments later that he would answer questions). In *Smith*, the Supreme Court noted "[w]here nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Id*. Although an accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself, such subsequent statements are relevant to the distinct question of waiver. *Id*. at 100.

When a suspect invokes the right to counsel, the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the

46

police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).  This is true even when different law enforcement authorities who may be unaware of the suspect's prior invocation of his Fifth Amendment right to counsel reapproach the suspect regarding a different offense.  *See Arizona v. Roberson*, 486 U.S. 675, 687 (1988) ("[W]e attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel.").  The Second Circuit has said that, once a suspect has invoked the *Miranda* right to counsel, the ban on further police-initiated questioning is absolute.  *See Quiroz*, 13 F.3d at 512.  The police may attempt to re-initiate interrogation after a break in custody of at least 14 days.  *Maryland v. Shatzer*, 559 U.S. 98, 110 (2010).  The *Edwards* rule is not violated where the police resume questioning after the defendant initiates further communication with them.  *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (defendant initiated further conversation by asking, "Well, what is going to happen to me now?").

Critically, *Miranda* rights, including the Fifth Amendment right to counsel, cannot be asserted outside the context of custodial interrogation.  *See United States v. Clark,* 600 F.Supp.3d 251, 271–72 (W.D.N.Y. 2022) (Wolford, C.J.) *citing United States v. Zaleski*, 559 F.Supp. 2d 178, 189 (D. Conn. 2008) ("An individual cannot, therefore, assert his or her *Miranda* right to counsel before he or she is in custody.")  Indeed, in *McNeil v. Wisconsin*, the Supreme Court held that assertion of a Sixth Amendment right to counsel does *not* impliedly invoke a Fifth Amendment right to counsel, and stated "[w]e have in fact *never* held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'"  501 U.S. 171, 182 n.3 (1991).  The Second Circuit has adopted the *McNeil* Court's rationale, holding that a defendant can only invoke the Fifth Amendment right to

counsel once it attaches in the context of custodial interrogation." *United States v. Thompson*, 35 F.3d 100 (2d Cir. 1994).

**4.** **Miranda – Subsequent Provision of Warnings After Prior Questioning[16]**

Even if an initial confession is improperly obtained without the required *Miranda* warnings, the government is not precluded from introducing a subsequent confession obtained after the warnings have been properly administered. *Oregon v. Elstad*, 470 U.S. 298, 318 (1985); *Tankleff v. Senkowski*, 135 F.3d 235, 244–45 (2d Cir. 1998). This principle does not, however, permit officers to employ a "question first" strategy, in which they deliberately withhold *Miranda* warnings until a suspect has confessed and then give the warnings in the midst of a coordinated and continuing interrogation. *See Missouri v. Seibert*, 542 U.S. 600 (2004); *see also United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (*Seibert* creates an exception to *Elstad* rule but does not otherwise overrule it).

In *United States v. Capers*, 627 F.3d 470, 477–80 (2d Cir. 2010), the Second Circuit announced an objective, "totality of the circumstances" test, under which the government has the burden of proof, to determine whether a two-step interrogation by the police was deliberate. *See United States v. Williams,* 681 F.3d 35, 43–45 (2d Cir. 2012) (totality of circumstances showed that officer was not "intentionally undermining *Miranda*," and defendant's second set of statements was admissible despite earlier violation of *Miranda*). In determining whether a deliberate two-step interrogation occurred, courts consider the following five factors: (1) the completeness and detail of the questions and answers in the first round of interrogation, *see United States v. Moore*, 670 F.3d 222, 231 (2d Cir. 2012)); (2) the overlapping content of the two statements (where there is little overlap, this factor weighs in

_____

[16] This section is provided in reference to FN 15, *supra*, and is discussed further in the Argument section *infra*.

favor of the government), *id*.; (3) the timing and setting of the interrogations, *see United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012); (4) the degree of continuity of police personnel in the two interviews, *see Moore*, 670 F.3d at 232; and (5) the time lapse between the two interviews, *id.*

### 5.      Miranda – Waiver of Rights

To establish that a defendant validly waived *Miranda* rights, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving the right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995), *see also United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019).

The Supreme Court has held that "an express written or oral statement of waiver of the right to remain silent or of the right to counsel" is not required, and instead waiver may be inferred from "silence, coupled with an understanding of [the defendant's] rights and a course of conduct indicating waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). The determination of whether a suspect has knowingly and voluntarily waiver their Miranda rights depends upon the totality of the circumstances. *See Michael C.,* 442 U.S. at 725. Relevant factors include the conduct of the police, *see United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991); the suspect's age, intelligence and education, *see United States v. Male Juvenile*, 121 F.3d 34, 40–41 (2d Cir. 1997); language barriers, *see Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989); the suspect's mental and physical condition, *see O'Brien*, 926 F.3d at 74–75); and the suspect's prior experience with the criminal justice system, *see United States v. Scarpa*, 897 F.2d 63, 69 (2d Cir. 1990); *see also United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989).

**6.    Sixth Amendment Right to Counsel**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. CONST. AMEND. VI.  The Sixth Amendment attaches "at or after the initiation of adversary judicial criminal proceedings." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).  The Sixth Amendment does not attach even at the time of arrest on a complaint (*see United States v. Duvall*, 537 F.2d 15, 22 (2d Cir. 1976)), but does attach at the time of arraignment on a complaint (*see Rothgery v. Gillespie County, Tex.,* 554 U.S. 191, 194 (2008)). The Sixth Amendment is "offense specific"; a defendant to whom the right to counsel has attached for one offense may be questioned about other criminal conduct for which the right has not yet attached.  *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).

**C.    Analysis**

**1.    Mr. Gogolack's Statements to Law Enforcement on August 1, 2023**

Mr. Gogolack's was <u>never</u> in custody on August 1, 2023, and there are no facts in the record (nor sworn assertions from Mr. Gogolack) to the contrary.  Mr. Gogolack solicited the presence of law enforcement to his home by calling 911 and reporting that there was a deceased woman inside.  Mr. Gogolack was never handcuffed or otherwise restrained, and his provision of information to the local police department while at his own home was obviously and apparently non-custodial and voluntary.  All statements made by Mr. Gogolack to local law enforcement up until that point in time should therefore be admissible against him at trial.

When, *after* providing various statements to law enforcement, Mr. Gogolack was asked by local officers to sign a supporting deposition, he responded, in sum and substance, that he should speak to an attorney because he didn't want the police to "twist his words."  Although

this remark may not rise to the level of a clear and unequivocal invocation of the right to counsel, such determination is unnecessary where, as here, Mr. Gogolack was unquestionably not the subject of *custodial* interrogation – because such 5th Amendment right-to-counsel can only be invoked during a *custodial* interrogation.  Mr. Gogolack's Sixth Amendment right-to-counsel was also unquestionably inapplicable at a time when he was not detained, in custody, or arrested, let alone formally arraigned at a judicial proceeding.  Because Mr. Gogolack's comment that he "should speak to an attorney" was not, and could not have been, an invocation of his Fifth Amendment right-to-counsel, they likewise have no impact on his custodial interrogation the following day.  After Mr. Gogolack stated that he "should speak to an attorney", local officers at the scene ceased any questioning of him.  The subsequent spontaneous, voluntary, and unsolicited statements made by Mr. Gogolack directed at local law enforcement were not the product of any interrogation, let alone custodial interrogation, and should therefore be admissible against him at trial.  Similarly, Mr. Gogolack's statements to the Coroner should be admissible against him at trial because, regardless of whether the Coroner was a government agent, Mr. Gogolack was clearly not in custody at the time he made those statements in his own home.

### 2.    Mr. Gogolack's Traffic Stop and Arrest on August 2, 2023

Mr. Gogolack's August 2, 2023, arrest was the product of diligent, professional, and legitimate law enforcement activity by PO Wojciechowicz of the Depew Police Department.  PO Wojciechowicz, after being advised of a request for assistance by the FBI, investigated Mr. Gogolack's driving privileges and learned that they were presently revoked.  PO Wojciechowicz familiarized himself with Mr. Gogolack's physical appearance through a review of photographs in a law enforcement database.  When PO Wojciechowicz observed Mr. Gogolack operating a motor vehicle in the jurisdiction of Depew, NY, he had an apparent

and legitimate basis to stop the vehicle and place Mr. Gogolack under arrest for a violation of NYS VTL 511(2)(a)(ii) and 509-1.  Mr. Gogolack's conclusory claim that his arrest by the Depew Police Department was "illegal" is, quite literally, a baseless claim – because Mr. Gogolack does not even bother to offer an explanation or basis to the Court as to what made the arrest "illegal".  Further, Mr. Gogolack offers no affidavit disputing that (i) his license was revoked, (ii) he was operating a motor vehicle in Depew NY, or (iii) that such conduct is illegal under New York State law.  The Court should conclude that Mr. Gogolack's August 2, 2023 arrest by the Depew Police Department was in accordance with the New York State Vehicle and Traffic Law.

**3.      Mr. Gogolack's Statements to SA Jason Kammeraad on Scene of his Arrest**

SA Kammeraad, upon introducing himself to Mr. Gogolack at the scene of his arrest, asked Mr. Gogolack minimal preliminary questions about how and when Mr. Gogolack came into possession of Sharon Quinn's vehicle.  The government concedes that Mr. Gogolack was in custody at the time that questioning occurred, and that Mr. Gogolack had not at that time been provided with his *Miranda* warnings.  Any such interaction must have occurred before 20:17:00 hrs (8:17 p.m.) based upon PO Wojciechowicz's body-worn camera, which depicts him driving Mr. Gogolack away from the scene of his arrest at that time.  Approximately 75 minutes later, at 21:32 hrs (9:32 p.m.), after being transported to a different location, Mr. Gogolack was advised of his Miranda rights, in a video/audio recorded interview room.  The initial questioning by SA Kammeraad was extremely limited as compared with the subsequent interview conducted by SA Penna and SA Kammeraad.  Aside from a conclusory allegation by Mr. Gogolack's attorneys that all of Mr. Gogolack's statements were involuntary, no evidence or sworn assertions from Mr. Gogolack exist.  The record establishes

that Mr. Gogolack was not subjected to a deliberate two-step interrogation process and, as such, Mr. Gogolack's subsequent post-Miranda statements should be admissible.

### 4.    Mr. Gogolack's Statement to the FBI inside of the Depew Police Department

Once inside of the Depew Police Department interview room, Mr. Gogolack is properly Mirandized by FBI SA Adam Penna and SA Jason Kammeraad.  As the recording depicts, Mr. Gogolack is informed of his rights and impliedly waives those rights based upon his course of conduct both before, during, and after being *Mirandized*.  Mr. Gogolack was undoubtedly quite experienced with the criminal justice system – at the time of that interview, he was a previously convicted felon who had accrued a total of seven (7) criminal convictions. *See* Exhibit K.[17]  The recorded interview makes clear, in a way the transcript cannot truly capture, that Mr. Gogolack is a savvy and complex individual.  The recording also makes clear that Mr. Gogolack has a full understanding of the English language.

Mr. Gogolack's statements from 21:32 until 21:50:54, before Mr. Gogolack brings up the topic of a "lawyer" should be admissible against him.  The statements were the product of a knowing, intelligent, and voluntary waiver of his Miranda rights.

At 21:50:54, as the Court will observe for itself, Mr. Gogolack, an experienced criminal actor, begins to employ what can best be described as a tactic.  Mr. Gogolack – in the midst of a response to a question, states "I'm just saying "lawyer" but I'll answer your questions.  Okay, so, keep asking, but I'm just saying, I wanna speak to an attorney…so I just, I'll answer all your shit though, so keep…you can keep going."  It is the government's position that a review of the entire interview makes it apparent that this statement by the

---

[17] Exhibit K, provided to the Court and defense counsel separately and requested to be filed under seal, consists of Mr. Gogolack's Criminal History (GOV-00000425).

defendant is designed to continue the unrepresented interview, while attempting to pre-emptively make it inadmissible in Court.  It is the government's position that the exchange between Mr. Gogolack and the agents, when viewed in its entirety, does not amount to a clear and unequivocal invocation of the right to counsel.  After requesting to speak to an attorney, before the agents can even move, Mr. Gogolack repeatedly and immediately re-initiates the interview with them by making statements like "Keep asking", "I'll answer all your shit though", and "So if I can help you out man…"  The defendant's double-speak is designed to permit him to make the exact argument he presently raises with the Court, but it is the furthest thing from a sincere invocation of the right to terminate an interview so that he can consult with counsel.

Although the agents, doubtless confused and flustered by the defendant's double-speak, continue the interview for approximately 4 minutes, until about 21:55:00, when they end the interview and leave the room to regroup.  The agents are gone for approximately 37 minutes, until about 22:32:42.  At this point, the agents tell Mr. Gogolack to listen to them as they explain that they have a warrant for his cell phone and provide him with a copy of the warrant.  The agents' confusion about Mr. Gogolack's tactic is apparent, as they state "You've been helpful, but you're mixing words a little bit, right?  So do you have a lawyer?  Is there somebody you want us to call for you?  Do you want us to find a lawyer for you?  Cause you were being super helpful, then you said, like 'lawyer, I don't want to incriminate myself', and we take that seriously.  If there's someone you want us to call, we'll call."  Mr. Gogolack redirects the conversation, asking the agents questions about the search warrant they served on him, and following that up with "If there's anything I can seriously help you with…"  The agents then attempt to clarify, multiple times, if Mr. Gogolack actually wants a lawyer, and

54

advise him that he is presently free to leave the Depew PD.  Mr. Gogolack repeatedly assures the agents that he does *not* want a lawyer.  They advise him that if that changes, he can let them know.

This interaction with Mr. Gogolack includes him being repeatedly re-advised of his right to have an attorney present and includes the agents offering to call a lawyer "right now".  Mr. Gogolack chooses, once again, to knowingly, intelligently, and voluntarily waive that right and engage in an interview with the agents.  As such, all of Mr. Gogolack's statements from 22:32:42 through the conclusion of the interview at 22:56:58, should be admissible against Mr. Gogolack at trial.

Finally, as to Mr. Gogolack's inquiry as to what statements to law enforcement the government intends to introduce at trial, the government intends to introduce all statements made by Mr. Gogolack to law enforcement referenced in this brief or any of the attached exhibits.

### VIII.  The Court Should Deny Mr. Gogolack's Motion to Suppress Cellular Telephone Evidence

Mr. Gogolack next contends that the contents of his cell phone should be suppressed.  Dkt. 690 at 23 ¶¶ 86–89.  Mr. Gogolack's motion presses two claims.  First, Mr. Gogolack argues that the cell phone "was seized without probable cause by the Depew Police Department."  *Id.* at ¶ 87.  Second, Mr. Gogolack claims that the warrant subsequently obtained by the FBI was overly broad, as it permitted law enforcement to search for and seize "[a]ny photographs or videos in the cellular telephone depicting Crystal Quinn or others inside" Mr. Gogolack's residence.  *Id.* at ¶ 88.  Both of these claims fail.  The Depew Police Department appropriately seized Mr. Gogolack's phone incident to his arrest.  Likewise, photographic evidence of Ms. Quinn's presence at Mr. Gogolack's residence, where she was

found dead, was relevant and particular association evidence that the warrant authorized law enforcement to collect.

### A.     Factual Background

As previously noted, on August 2, 2023, Depew Police Officer Wojciechowicz arrested Mr. Gogolack for violating New York State Vehicle and Traffic Law § 511 (Aggravated Unlicensed Operation of a Motor Vehicle).  *See* Exhibit G; GOV-00029150–29153.   At that time, PO Wojciechowicz seized Mr. Gogolack's cell phone incident to arrest.  *Id.* at GOV-29151.

Later that day, FBI Special Agent Jason Kammeraad obtained a federal search warrant for Mr. Gogolack's cell phone.   *See* Exhibit L; GOV-00030250–30254.   That warrant authorized law enforcement to search for and seize "[i]tems comprising evidence of, or property designed for use, intended for use, or used in committing violations of Title 21, United States Code, Sections § 841(a)(1), and 843(b) . . ."  *Id.* at GOV-00030253.   More specifically, the warrant authorized law enforcement to search for and seize "[a]ny photographs or videos in the cellular telephone depicting Crystal Quinn or others possessing or using controlled substances" and "[a]ny photographs or videos depicting Crystal Quinn or others inside of 296 Scott Avenue, Wellsville, New York," Mr. Gogolack's residence. *Id.* Consistent with Special Agent Kammeraad's supporting affidavit, evidence of Mr. Gogolack's association with Ms. Quinn and Ms. Quinn's association with 296 Scott Avenue, where, as noted in Special Agent Kammeraad's supporting affidavit, Mr. Gogolack claimed that another individual lived in the downstairs portion of 296 Scott Avenue. *See* Exhibit M at 10 ¶ 23(i)

### B.       Legal Framework

### 1.       Seizures of Electronic Devices Incident to Arrest

"[I]nterests in officer safety and evidence preservation that are typically implicated in arrest situations" allow an officer to properly search an individual's person upon arrest. *Arizona v. Gant*, 556 U.S. 332, 338 (2009).  The seizure of evidence from a search incident to arrest "requires no additional justification; rather, it is the fact that the lawful arrest which establishes the authority to search a person, and to seize evidence from that search."  *United States v. Handler*, No. 23-cr-4 (JHR), 2023 WL 2584217, at *3 (S.D.N.Y. Mar. 21, 2023) (seizure of cell phones that were on the defendants' persons at the time of the arrest fell within the search incident to arrest exception).

### 2.       The Fourth Amendment's Particularity Requirement

The Fourth Amendment dictates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "A warrant, therefore, can be unconstitutionally infirm in two conceptually distinct but related ways: either by seeking specific material as to which no probable cause exists, or by giving so vague a description of the material sought as to impose no meaningful boundaries."  *United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009).

The particularity requirement is designed to prevent the "general, exploratory rummaging in a person's belongings" that general warrants during colonial rule allowed. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  A sufficiently particular warrant is one that "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize."  *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992).

57

Under Second Circuit law,

> [t]o be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements. First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Finally, the warrant must specify the items to be seized by their relation to designated crimes.

*United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal quotations and citations omitted), *overruled on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018). Moreover, the Fourth Amendment "requires particularity in the warrant, not in the supporting documents," and, accordingly, "[t]he fact that the [warrant] application adequately described the 'things to be seized' does not save the warrant" from failure to satisfy the particularity requirement. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

Beyond satisfying these core metrics, the particularity requirement does not demand that warrants to comply with a set of bright-line rules. As relevant here, "the necessity of a temporal limitation," for instance, "depends on the context of the case." *United States v. King*, No. 21-CR-255 (NSR), 2022 WL 875383, at *4 (S.D.N.Y. Mar. 24, 2022) (quoting *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 306 (S.D.N.Y. 2018)); *Pinto-Thomaz*, 352 F. Supp. 3d at 306 ("[A] temporal limitation 'is not an absolute necessity, but is only one indicium of particularity' in a warrant." (quoting *United States v. Hernandez*, No. 09 CR 625( ), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010)). In that respect, "[t]he complexity and duration of the alleged criminal activities" may "render a time frame less significant than in a case that required a search for a small set of discrete items related to one or only a few dates." *Hernandez*, 2010 WL 26544, at *11.

### C.    Analysis

Mr. Gogolack's motion fails on both fronts.  First, PO Wojciechowicz properly seized Mr. Gogolack's cell phone incident to his arrest.  *See* Exhibit G; GOV-29151; *Handler*,  2023 WL 2584217, at *3 (concluding that the seizure of a cell phone incident to a defendant's arrest is proper under the Fourth Amendment).  Moreover, Mr. Gogolack left his cell phone in Sharon Quinn's vehicle, over which he cannot assert a reasonable expectation of privacy.

Second, the warrant is not overly broad.  For starters, the warrant authorized the search of Mr. Gogolack's cell phone for specific information relevant to Ms. Quinn's death that fell within the statutory ambit of 21 U.S.C. §§ 841(a)(1) and 843(b).  *See Ulbricht*, 858 F.3d at 99 (requiring warrants to (1) identify the specific offense for which the police have established probable cause; (2) describe the place to be searched; and (3) specify the items to be seized by their relation to designated crimes).  As relevant here, among this evidence, law enforcement was authorized to search for "[a]ny photographs or videos depicting CRYSTAL QUINN or others inside of 296 Scott Avenue, Wellsville, New York."  *See* Exhibit L; GOV-00030253.

That evidence was plainly relevant to ascertaining whether Ms. Quinn had an existing association with Mr. Gogolack, who distanced himself from Ms. Quinn's death by reporting to local law enforcement that another individual lived in the downstairs portion of the residence in which Ms. Quinn's body was recovered.  Thus, if a search of Mr. Gogolack's phone revealed photographic or video evidence of either Ms. Quinn or other individuals at 296 Scott Avenue, it could either corroborate or disprove Mr. Gogolack's own representations regarding who controlled the downstairs area of the residence.  In turn, such evidence could significantly contribute to the government's evaluation of whether Mr. Gogolack or another

individual distributed a controlled substance to Ms. Quinn in violation of 21 U.S.C. § 841(a)(1).[18]

Furthermore, the warrant was particularized in several other respects: it temporally limited law enforcement to seizing location data after July 28, 2023, and limited law enforcement to only searching for a seizing calls, text messages, and emails related to drug trafficking or Ms. Quinn.  *See* Exhibit L; GOV-00030253.  Thus, the lack of any temporal limitation as to any photographic or video evidence of Ms. Quinn did not transform the otherwise "particularized [warrant] into an unconstitutional general warrant." *Hernandez*, 2010 WL 26544, at *11.

### IX.    The Court Should Deny Mr. Gogolack's Motion to Suppress the Fruits of the August 5, 2023, Search of 296 Scott Avenue.

Mr. Gogolack next moves to suppress the fruits of the August 5, 2023, search of 296 Scott Avenue.  *See* Dkt. 690 at 23–24 ¶¶ 86–93.  Mr. Gogolack generally argues that FBI Special Agent Penna's application "did not set forth any basis for probable cause that [Mr. Gogolack] was involved in the death of [Ms.] Quinn," and thus "should be invalidated." *Id.* at 23 ¶ 88.  Furthermore, Mr. Gogolack contends that "the warrant [was] overbroad, as it allow[ed] for [the] collection of any items containing skin cells, which gave officers unfettered authority to take any item in the house." *Id.* at ¶ 89.  This motion should be rejected because Special Agent Penna's affidavit amply established probable cause for each of the target offenses and the warrant was sufficiently particularized.

---

[18] Even if the search warrant were insufficiently particularized, the Second Circuit has not resolved to what extent, if at all, the Fourth Amendment's particularity requirement demands the inclusion of a temporal limitation in the search warrant.  Accordingly, the government acted in good faith in executing the search warrant issued by the Magistrate Court.

### A.    Factual Background

On August 5, 2023, the Magistrate Court authorized a search warrant of Mr. Gogolack's residence located at 296 Scott Avenue.  *See* Exhibit N; GOV-00030255–30259. That warrant authorized law enforcement to search for, among other items, "[b]lood, semen, skin cells, or other biological materials that can be analyzed to determine the presence of other individuals *in proximity to the location of a dead body.*"  *Id.* at GOV-00030259 ¶ (f) (emphasis added).  That evidence, per the warrant, was related to the following offenses: 18 U.S.C. §§ 4 (misprision of a felony); 1001 (false statements); 922(g)(3) (unlawful user in possession of firearms); 924(c)(1)(A) (possession of a firearm in furtherance of drug trafficking); 1513(a)(1) (witness retaliation); and 21 U.S.C. §§ 841(a)(1) (distribution of a controlled substance resulting in death) and 846 (narcotics conspiracy).  *Id.* at GOV-00030255.

With respect to the witness retaliation offense, Special Agent Penna's affidavit explained, in detailed, ███████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████ *See* Exhibit O at 9–10 ¶ 22.  ████████

███████████████████████████████████

█████  *See id.* at 11–12 ¶¶ 26–28.  Special Agent Penna further noted that ████████

███████████████████████████████████

████████████████████. *Id.* at 12 ¶ 30.

Special Agent Penna also noted that ██████████████████████

███████████████████████████.  *See id.* at 16 ¶ 42.

███████████████████████████████████

61

██████████████████████████████████████████████████

████████████████████████████████.  *Id.* at ¶ 42 (b)–(c).  █████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████  *Id.* ¶ 42(f).

Next, Special Agent Penna detailed ████████████████████████████

██████████████████████████████████████████████████.

*See id.* at 17–19 ¶ 45 (a)–(j).  Most notably, Special Agent Penna noted that ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████.  *See generally id.*

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████  *See id.* at 19 ¶ 46.  ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████  *Id.* at 23 ¶ 56.  ████████████████

██████████████████████████████████████████████████

██████████████████████████████████  *See id.* at 21–22 ¶ 51.  ████████████

██████████████████████████████████████████████████

████████████████



*Id.* at 24–25 ¶ 61.

Finally, Special Agent Penna detailed ███████████████████████████ ███████████████████████████████████████. *See id.* at 28 ¶ 71.

## B.     Analysis

Mr. Gogolack's motion to suppress the fruits of the search of 296 Scott Avenue fares no better than his other motions. First, Special Agent Penna's affidavit established probable cause to search for evidence of violation of 18 U.S.C. § 1513. In particular, the affidavit established that ███████████████████████████████████████

███████████████████████████████████████

63



Taken all together, there was ample basis for the Magistrate Court to conclude that evidence relating to witness retaliation would be found in Mr. Gogolack's residence.

Second, contrary to Mr. Gogolack's contention that its authorization of the collection of skin cells effectively permitted "officers . . . to seize any item in the house," Dkt. 690 at 23 ¶ 91, the warrant expressly contemplated the collection of material "in proximity to the location of a dead body," GOV-00030259. This language "enable[d] the executing officer[s] to ascertain and identify with reasonable certainty those items that the magistrate . . . authorized [them] to seize." *George*, 975 F.2d at 75. Consequently, the warrant is sufficiently particularized. For these reasons, the Court should deny Mr. Gogolack's motion to suppress the August 5, 2023, search of 296 Scott Avenue.

**X.    The Court Should Deny Mr. Gogolack's Motion to Suppress the Fruits of the September 14, 2023, Search of 296 Scott Avenue.**

Lastly, Mr. Gogolack moves to suppress the fruits of a second search executed at 296 Scott Avenue stemming from a search warrant issued on September 14, 2023. *See* Dkt. 690 at 24–25 ¶¶ 94–100. That search warrant authorized law enforcement to look for evidence

relating to a kidnapping that occurred at 296 Scott Avenue approximately six months earlier. *See* Exhibit P, GOV-00030274–30277. Mr. Gogolack argues that any probable cause supporting the search warrant was stale, and thus that the evidence must be suppressed. *See id.* at 97. The Court should reject this argument.

"A warrant may lack probable cause and become 'stale' when the evidence supporting it is not sufficiently close in time to the issuance of the warrant." *United States v. Serrano*, 192 F. Supp. 3d 407, 409 (S.D.N.Y. 2016) (quotations and citation omitted); *see also United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015) ("[W]e may conclude that a warrant lacks probable cause where the evidence supporting it is not sufficiently close in time to the issuance of the warrant that probable cause can be said to exist as of the time of the search—that is, where the facts supporting criminal activity have grown stale by the time that the warrant issues." (quotations and citation omitted)). Though there is no bright-line rule to determine staleness, "[t]wo critical factors" identified by the Second Circuit to assist courts in this assessment "are the age of those facts and the nature of the conduct alleged to have violated the law." *United States v. Ortiz*, 143 F.3d 728, 732 (2d Cir. 1998) (quotations and citations omitted).

Here, as FBI Special Agent Penna's affidavit explains, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Exhibit Q at 3 ¶ 9. Special Agent Penna then explained, at length, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* at 3–6 ¶¶ 9–17. In particular, Special Agent Penna relayed ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *Id.* at 4 ¶ 10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at 6–

7 ¶ 18. ████████████████████████████████████ *See generally id.* at

7–9.  Thus, though the crime occurred in March 2023, the FBI's photographs of the evidence

germane to the kidnappings on August 8, 2023, restarted the staleness clock.  In other words,

the staleness clock was "refreshed" when the FBI observed the evidence relevant to the

kidnappings in August 2023.

After that point, Mr. Gogolack had little opportunity to destroy the evidence.  Mr.

Gogolack was charged via Criminal Complaint on August 17, 2023, and arraigned on August

23, 2023.  *See id.* at 9 ¶ 20 n. 3, 11 ¶ 21.  As such, from between August 23, 2023, and

September 14, 2023, Mr. Gogolack could not have removed the evidence from his home.

Thus, Mr. Gogolack was detained for 22 of the 37 days that transpired between the initial

August 8th search of 296 Scott Avenue and the Magistrate Court's issuance of the September

14th warrant.  Accordingly, the Magistrate Court was well within its right to determine that

there was a "fair probability that contraband or evidence of a crime" would be found at 296

Scott Avenue and Mr. Gogolack's motion to suppress should be denied.  *United States v. Ponce*,

947 F.2d 646, 650 (2d Cir. 1991).[19]

---

[19] Even if the warrant were lacking in probable cause, the government's good-faith reliance on it defeats Mr. Gogolack's motion, as the warrant was not so "facially deficient the reliance upon it [was] unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

66

## CONCLUSION

For the reasons stated herein, the government respectfully asks the Court to deny Mr.

Gogolack's omnibus dispositive motions (Dkt. 690) in full.

DATED:  Buffalo, New York, December 23, 2025.

Michael DiGiacomo
United States Attorney


BY:    s/ CASEY L. CHALBECK
       s/ NICHOLAS T. COOPER
       s/ JOSHUA A. VIOLANTI
       s/ JOSEPH M. TRIPI
       Assistant United States Attorney
       United States Attorney's Office
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York 14202
       (716) 843-5881
       Casey.Chalbeck@usdoj.gov