IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                    23-CR-99-EAW

SIMON GOGOLACK, et al.,

Defendants.

---

### GOVERNMENT'S RESPONSE TO DEFENDANT SIMON GOGOLACK'S SUPPLEMENTAL MOTION TO DISMISS THE INDICTMENT AND SUPPRESS STATEMENTS

On February 4, 2026, defendant Simon Gogolack filed a supplemental affidavit in support of his pending motions to suppress statements and dismiss the indictment on constitutional speedy trial grounds. *See* Suppl. Aff., Dkt. 751, (dated Feb. 4, 2026). The government offers this supplemental memorandum in response to Mr. Gogolack's arguments and respectfully asks this Court to deny his motions (Dkt. 690).

### I.       Mr. Gogolack's Motion to Suppress Statements Should be Denied.

Mr. Gogolack moves to suppress any statements he made to law enforcement. *See* Dkt. 690, at ¶¶ 79–84. In support of this motion, Mr. Gogolack claims that (i) the statements were the result of an unlawful detention; (ii) the statements were the product of custodial interrogation without Miranda warnings; and (iii) the statements were made in violation of his right to counsel. *Id.* at ¶ 81. Mr. Gogolack later filed an affidavit making non-detailed, conclusory statements that he was "interrogated by law enforcement without having been advised of my Miranda warnings" and that law enforcement "continued to question me after I invoked my right to counsel." *See* Dkt. 736. Mr. Gogolack's affidavit does not contest any of the specific facts set forth in the government's response (Dkt. 723) or in the record of

1

exhibits contained in that response. Indeed, during Oral Argument, Mr. Gogolack spontaneously expressed his general agreement with the government's recitation of the facts.

Following Oral Argument, Mr. Gogolack filed a supplemental brief in support of his motion to suppress statements, arguing that (1) statements Mr. Gogolack made to the Depew Police Officer during the transport to the police department were in response to custodial interrogation; (2) the statements that Mr. Gogolack made after waiving his Miranda rights at the Depew Police Department should be suppressed because the government has failed to establish that it did not engage in a deliberate, two-step interrogation process; and (3) Mr. Gogolack invoked his right to counsel.  For the reasons that follow, the motion should be denied.

### A.    Relevant Background

The government has previously outlined, in detail and with citations to exhibits, relevant factual background related to the defendant's motion for suppression.  *See* Dkt. 723. The government incorporates that background herein by reference.  To the extent that the defendant's supplemental filing calls for additional examination of certain specific facts, that examination follows.

### 1.  SA Kammeraad's Affidavit & SA Penna's Affidavit

On February 18, 2026, SA Jason Kammeraad signed an affidavit documenting his recollection of his interactions with Mr. Gogolack on August 2, 2023.  *See* Exhibit 1.  On February 18, 2026, SA Adam Penna signed an affidavit documenting his recollection of what occurred on August 2, 2023, at the scene of the traffic stop in Depew New York.  *See* Exhibit 2.

2

According to those affidavits, SA Kammeraad engaged in a brief conversation with Mr. Gogolack near the rear of the Depew Police vehicle after he was arrested by the Depew Police Officer. *See* Exhibit 1. SA Kammeraad introduced himself to Mr. Gogolack as an FBI Special Agent, and recalls advising him, in sum and substance, that the FBI just wanted to find out what happened to Crystal Quinn while she was in Wellsville. *Id.* at ¶ 5. SA Kammeraad recalls asking Mr. Gogolack several general questions related to Sharon Quinn's car and how Crystal Quinn had ended up in Wellsville, New York. *Id.* at ¶ 6. SA Kammeraad recalls that entire interaction lasting approximately 15 minutes. *Id.* at ¶ 9. SA Kammeraad's initial conversation with Mr. Gogolack was general in nature, and did not involve the type of specific, detailed questions that would later occur during the interview at the Depew Police Department. *Id.* at ¶ 14.

Moreover, SA Kammeraad described the purposes of his initial conversation was to introduce himself, explain why the FBI wanted to talk to Mr. Gogolack, and build rapport with Mr. Gogolack before conducting a formal interview. *Id.* at ¶ 7. SA Kammeraad expressly denies that he was motivated to engage in that initial conversation for the purpose of undermining the later issuance of *Miranda* warnings. Id. at ¶ 7.

Furthermore, SA Kammeraad's time at the scene in Donna Court, Depew, New York, was mostly spent reviewing the contents of Sharon Quinn's vehicle with her, discussing with Sharon Quinn the circumstances surrounding the death of her daughter, and engaging in other activity not related to talking to Mr. Gogolack. *Id.* at ¶ 10. SA Kammeraad arrived with SA Penna at the Depew Police Department at around 9:23 PM, where they encountered Mr. Gogolack and the local Depew PD officer in the booking area. *Id.* at ¶ 11. SA Kammeraad

3

and SA Penna were present with Mr. Gogolack in the booking area for about 8 minutes before he was transported into the Interview room. *Id.* at ¶ 11, *see also* Exhibit 2 at ¶ 6.

During that timeframe, SA Kammeraad and SA Penna discussed with Mr. Gogolack the logistics of a potential interview, but did not substantively question him. Exhibit 1 at ¶ 12, Exhibit 2 at ¶ 7. Once in the interview room, SA Kammeraad and SA Penna conducted a fulsome interview of Simon Gogolack that covered a much broader scope of content than the initial conversation SA Kammeraad had with Simon Gogolack on the scene of the traffic stop. Exhibit 1 at ¶¶ 14–15. The interview at the Depew Police Department occurred approximately 2 hours after the initial discussion during the traffic stop. *Id.* at ¶ 16.

### 2. Body Camera Depicting Transport of Simon Gogolack to Depew PD

All of Mr. Gogolack's interactions with Depew Police Officer Wojciechowicz during the transportation from Donna Court to the Depew Police Department are captured on body-worn camera. *See*, Dkt. 723, Ex. H (file entitled "VDPD-BC152_25_080223235231_4.mp4").

At about 20:17:30[1], PO Wojciechowicz enters the patrol vehicle and advises Mr. Gogolack that law enforcement has his father's phone number and relayed to his father that Mr. Gogolack would be released within the next couple of hours. *Id.* Mr. Gogolack expresses gratitude and then tells PO Wojciechowicz that he [Gogolack] could "go for a steak and a jacuzzi." *Id.* PO Wojciechowicz does not ask Mr. Gogolack any questions at this point. *Id.*

Mr. Gogolack then initiates a conversation with PO Wojciechowicz, asking him, "Wanna know what's really shitty?" PO Wojciechowicz responds, "what's up?", to which Mr. Gogolack volunteers, in sum and substance "looking back, it seems like she just had her

---

[1] Citations are to the timestamp depicted in orange in the bottom-right corner of the screen. The undersigned endeavored to mark the citation at the beginning of whatever statement is being addressed.

mind made up to do that." *Id.* at 20:18:20.  PO Wojciechowicz responds "uh-huh" and Mr. Gogolack continues speaking.  *Id.* at 20:18:31.  PO Wojciechowicz eventually interjects by stating "no, I get you man . . . ." and then begins talking into his police radio, stating "Six, dispatch." *Id.* at 20:18:45.

Mr. Gogolack, who is a convicted felon and has been arrested on several occasions, continues to speak while PO Wojciechowicz communicates with someone else over the radio. *Id.*  Eventually, PO Wojciechowicz tells Mr. Gogolack to "hop over to the other side so that I can hear you." *Id.* at 20:18:55.  At this point, PO Wojciechowicz has still not asked Mr. Gogolack any questions.

Nevertheless, Mr. Gogolack continues to talk, unsolicited, about Crystal Quinn, stating "It's just, um, her mother said she did try killing herself a couple weeks ago . . . ." *Id.* at 20:19:01.  PO Wojciechowicz remarks, incredulously, "Crystal's mom . . . Jesus." *Id.* at 20:19:08.

Mr. Gogolack continues to spontaneously talk about Crystal Quinn.  *Id.* at 20:19:10. PO Wojciechowicz, apparently confused by what Mr. Gogolack is saying, states "but you're talking about Sharon." *Id.* at 20:19:35.  Mr. Gogolack then states "not Sharon herself, I'm talking about Crystal . . . Sharon was aware that Crystal, you know, tried to kill herself" to which PO Wojciechowicz states "gotcha." *Id.* at 20:19:44.

PO Wojciechowicz then attempts to direct the conversation *away* from the topic of Crystal Quinn, asking Mr. Gogolack "Can you feel the [air conditioning] at all?" *Id.* at 20:19:48.  For his part, Mr. Gogolack persisted in his desire to talk about Crystal Quinn, stating moments later,  "man I never gonna listen to anybody say that even if they seem nonchalant, I'm never gonna not take it seriously." *Id.* at 20:20:05.  PO Wojciechowicz

5

responds by stating "uh". *Id.* at 20:20:12. Mr. Gogolack continues to make unsolicited statements, including "thanks a lot, Crystal, thanks for coming out to the country with me, friggin' jerk." Id. at 20:20:44.

At 20:20:50, PO Wojciechowicz asks Mr. Gogolack his first bona fide question of their encounter: "How old was Crystal, she was young, right?" Mr. Gogolack responds "she was like three years younger than me, and I'm like 39, so maybe she was like four years younger, I was 84, maybe she was like '86 or '87." *Id.* at 20:20:51. PO Wojciechowicz remarks "Young, man." *Id.* at 20:21:04. Mr. Gogolack then remarks, unsolicited, "Yeah, she's wrapped up in that Peter Gerace case, the things that I've heard these feds doing to her, fucking sickos dude." *Id.* at 20:21:08. PO Wojciechowicz states "really . . .". *Id.* at 20:21:14.

Mr. Gogolack continues to remark, unsolicited, "I don't know what that dude's name was [unintelligible] relation to her, but, some sick ass shit, some situations that they put her in [unintelligible] just, really bogus shit . . . and you could tell, she was a stripper with a habit, she got caught up in that, c'mon, they'll use anything, you know, to plead somebody out." *Id.* at 20:21:21. PO Wojciechowicz responds "yeah, for sure." *Id.* at 20:21:44.

Mr. Gogolack then continues to make unsolicited remarks, including, in sum and substance "Like I said, I ran into her randomly and I had no idea about the shit that was going on". *Id.* at 20:21:52. PO Wojciechowicz asks a clarifying question, "are you talking about Crystal, like you ran into her randomly?" *Id.* at 20:22:04. Mr. Gogolack continues, stating "yah, we just uh, I took my friend's grandfather out, I was taking him to like a trivia night at the casino, we stopped at that Hoak's bar or whatever on Route 5, and um . . ." *Id.* at 20:22:07. PO Wojciechowicz interjects, asking "the fish place?", to which Mr. Gogolack responds "Yah." *Id.* at 20:22:18. PO Wojciechowicz, expressing interest for the first time, states "I

6

heard about that place, I heard it's a good joint." *Id.* at 20:22:19.  Mr. Gogolack goes on to describe his experience at Hoak's, stating "a storm was coming in over the water, and its perfect for that because its right off the back, and all you see is just the lightning, heavy lightning over you." *Id.* at 20:22:24.  PO Wojciechowicz interjects, stating "Niiiiice". *Id.* at 20:22:35.

Mr. Gogolack continues "but, um, I seen her, and then she ended up calling me that night cuz, uh, she said the girl she was with was just being an idiot, and she wanted me to come get her and hang out . . . and before this I literally don't think I saw her in like 10 years, so . . . ." *Id.* at 20:22:38.

PO Wojciechowicz then asks Mr. Gogolack "So how back do you, how far back do you and Crystal go?" *Id.* at 20:22:55.  Mr. Gogolack responds, "Since elementary school, man." *Id.* at 20:22:58.  PO Wojciechowicz replies, "No kidding!  So you're originally from around here?" *Id.* at 20:23:01.  Mr. Gogolack states, "Yeah, I grew up in Depew." *Id.* at 20:23:05.  PO Wojciechowicz responds, stating "No kidding, and now you live in where, Wellsville?" *Id.* at 20:23:10.  Mr. Gogolack states "Yeah, I bought a house and got out of the damn city." *Id.* at 20:23:13.  PO Wojciechowicz states, "Oh, good for you."

Mr. Gogolack continues, stating something to the effect of "burned down a nice one". *Id.* at 20:23:18.  PO Wojciechowicz states "huh, yeah, I mean, crappy circumstances but . . . ." *Id.* at 20:23:20.  Mr. Gogolack continues volunteering information about Ms. Quinn, stating "but she umm, she had to be no more than three years, I don't think, behind me.  She used to hang out with some of my other friends." *Id.* at 20:23:26.  PO Wojciechowicz states "Uh huh". *Id.* at 20:23:40.  Mr. Gogolack continues, "but I never really, you know, she was like a younger girl, kinda, of the circle.  So uh, but no we've been actually, like that inner

7

group of us was like 5, 10 kids, since it has to be like 5th, 6th grade, literally. We were just talking about it, you know, we're the last damn ones left." *Id.* at 20:23:40. PO Wojciechowicz responds "gotcha". *Id.* at 20:24:00.

Mr. Gogolack continues, unsolicited, stating "But yah I went to, uh, the country to slow down, but you know what, there's a bunch of weirdos out there too. If they're not weirdos in one way, they're weirdos in another way." *Id.* at 20:24:06. PO Wojciechowicz responds "Oh, for sure." *Id.* at 20:24:19. Mr. Gogolack continues, stating "Frickin'-A dude, these guys are identifying as animals now, wear like dog suits and shit, these guys are circling around in their weird bikes." *Id.* at 20:24:20. PO Wojciechowicz responds, stating "Yah man, it's definitely nuts, the stuff that you see happening nowadays . . . ." *Id.* at 20:24:40. Mr. Gogolack interjects, stating "especially, it's like, per capita, its almost unbelievable, because you know, the numbers are so much lower out there . . . ." *Id.* at 20:24:47. PO Wojciechowicz responds "Oh, for sure." Id. at 20:24:55.

Mr. Gogolack then states, "Like I think some of the graduating classes are like, a couple hundred, you know?" *Id.* at 20:24:56. PO Wojciechowicz responds "uh-huh". Id. at 20:25:01. The recording ends with PO Wojciechowicz announcing over the radio "Six, dispatch, 8–5" and getting out of the vehicle. *Id.* at 20:25:10.

### 3. **Booking of Simon Gogolack at Depew PD**

The Depew Police Department provided video footage (all of which was produced natively in Discovery) from the following cameras – Booking, Hallway, Hallway-by-Sallyport, Hallway-Interview-Room #1, Main Lobby Stairs, Safe Trade Camera, Sallyport Door, Sallyport Gate. From review of the footage, only the "Hallway Interview-Room #1" is recording audio, in addition to video. Footage from that camera was produced as part of

the government's response brief.  *See* Dkt. 723, Exhibit I.  In support of this response in opposition to the defendant's supplemental brief, the government is providing the Court with all of the video that it has from all of the cameras at the Depew Police Department during the date/time in question.  *See* Exhibit 3.[2]

At about 20:25:15, PO Wojciechowicz's vehicle can be seen pulling into the driveway of the Sally Port of the Depew Police Department.  *See* Exhibit 3, Sally Port Gate.  At about 20:25:18, PO Wojciechowicz's vehicle can be seen pulling up to the Sally Port door.  *See* Exhibit 3, Sally Port Door.  At about 20:26:17, PO Wojciechowicz escorts Simon Gogolack inside the Depew Police Department Sally Port entrance.  *See* Exhibit 3, Sally Port Door. At about 20:16:18, PO Wojciechowicz escorts Simon Gogolack inside the Depew Police Department.  *See* Exhibit 3, Hallway.  At about 20:26:30, Simon Gogolack and PO Wojciechowicz enter the Depew Police Department booking area.  *See* Exhibit 3, Booking. FBI SA Adam Penna and FBI SA Jason Kammeraad arrive at the Depew Police Department booking area at about 21:23:02, approximately 57 minutes after Simon Gogolack and PO Wojciechowicz arrived at the booking area.  *See* Exhibit 3, Booking.  SA Penna (and later, SA Kammeraad) can be seen briefly conversing with Simon Gogolack until about 21:28:30, when the agents leaving the booking area.  *See* Exhibit 3, Booking.  At 21:29:05, SA Penna and SA Kammeraad return to the booking area, where they continue to communicate with Simon Gogolack until about 21:32:00, when the three of them leave the booking area

---

[2] Exhibit 3 consists of the entire production of video from the Depew Police Department, as well as the "Axis" player used to display such video.  The government previously provided the Court with only the Interview room footage in an effort to simplify the Court's review.  In response to the latest inaccurate claims by the defendant, the government provides the Court with all of the footage.  It is the government's understanding that only the Hallway Interview Room footage contains audio.  Because the video interview of Mr. Gogolack contains references to a minor by name, the government requests that Exhibit 3 be accepted by the Court under seal.  The government will submit a formal motion requesting the sealing of Exhibit 3 for the Court's review separately.

together.  *See* Exhibit 3, Booking.  SA Kammeraad, Simon Gogolack, and SA Penna then walk down the hallway into the interview room, arriving at the interview room at about 21:32:16.  At 21:32:30, the audio footage from the interview room begins recording.  *See* Exhibit 3, Hallway Interview Room #1.  At 21:32:37, the video footage from the interview room begins recording.  *See* Exhibit 3, Hallway Interview Room #1.

### B.    Legal Framework

#### 1.    Miranda Warnings – Interrogation[3]

For the *Miranda* advice-of-rights requirements to be triggered, the defendant must be subjected to "custodial interrogation."  *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).  The term "interrogation" includes express questioning of the suspect and its "functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Whether interrogation has occurred does not turn on the subjective intent of the police; the relevant test looks at "the perspective of the suspect."  *Perkins*, 496 U.S. at 296.

Volunteered statements that are made by a suspect not in response to questions or actions by law enforcement are not the result of interrogation and do not require *Miranda* warnings.  *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966), *see also United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017).  Likewise, interrogation does not occur where a question was asked out of "curiosity" rather than for an investigatory purpose, *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987), or when a defendant and a police officer are engaging in casual

---

[3] In its prior briefing, the government provided legal framework for the "custody" portion of the *Miranda* analysis. Because the defendant's arguments in his supplement are mainly focused on specific statements where the government does not contest that Mr. Gogolack was in custody, that section is not reproduced here.

conversation. *See United States v. McConer*, 530 F.3d 484, 497 (6th Cir. 2008) (noting that a "casual background question" did not rise to the level of interrogation); *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation."); *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010) ("Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response."); *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984) ("Incriminating statements made in the course of casual conversation are not products of a custodial interrogation."); *United States v. Hackley*, 636 F.2d 493, 498 (D.C. Cir. 1980) ("[B]ut Fontanna's inquiry followed the casual conversation about [the defendant's] cousin Sharon and their attempt to reach her on the telephone, and, fairly construed, it was not directed at obtaining a confession."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 533 (E.D.N.Y. 2014) ("SA Ricciardi's small talk about the weather and his family, for instance, were not reasonably likely to elicit an incriminating response.").

Similarly, an officer's inquiry, in response to a suspect's "muttering" can be viewed more as "the product of curiosity" than the result of purposeful interrogation. *See United States v. Thomas*, 961 F.Supp. 43, 45 (W.D.N.Y., Apr. 7, 1997). In that same vein, an officer's limited clarifying questions made in response to a defendant's unsolicited utterance do not transform an otherwise casual communication between defendant and officer into an interrogation. *See United States v. Rommy*, 506 F.3d 108, 132–34 (2d. Cir. 2007) (limited clarifying follow-up questions to otherwise volunteered information does not constitute interrogation). In short, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 301.

## 2.    Miranda – Right to Counsel and Invocation

To invoke the Miranda right to an attorney, the suspect must make "some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). "A reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel" does not require the police to cease questioning. *Davis v. United States*, 512 U.S. 452, 459 (1994). The Supreme Court, in *Davis* went on to state

> When the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity' because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in *Edwards* requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer.

*Id.* (quoting *Michigan v. Mosley*, 423 U.S. 96, 102 (1975)). The Second Circuit has held that courts must "[r]esolve any doubts in favor of the conclusion that the suspect did not intend any waiver of his right to consult counsel." *United States v. Quiroz*, 13 F.3d 505, 511 (2d Cir. 1993).

The Second Circuit has held that the following statements are insufficient to constitute an unambiguous request for counsel: "Maybe I should talk to a lawyer," *Davis*, 512 U.S. at 462; a statement that the suspect had an attorney in another case coupled with a refusal to sign an advice-of-rights form, *see United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012); "I am not sure if I should be talking to you" and "I don't know if I need a lawyer" coupled with a refusal to sign a waiver form, *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011); "Do you think I need a lawyer?" *Diaz v. Senkowski*, 76 F.3d 61, 64–65 (2d Cir. 1996); and a suspect's

statement that he "was going to get a lawyer" without requesting one, *United States v. Scarpa*, 897 F.2d 63, 69–70 (2d Cir. 1990); *but see Wood v. Ercole*, 644 F.3d 83, 91–92 (2d Cir. 2011) ("I think I should get a lawyer" was unambiguous request for counsel).

That said, once a suspect clearly invokes the right to counsel, post-request responses to further interrogation may not be used "to cast doubt on the adequacy of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 98–99 (1984) (suspect clearly requested counsel even though he indicated only moments later that he would answer questions). In *Smith*, the Supreme Court noted "[w]here nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Id.* Although an accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself, such subsequent statements are relevant to the distinct question of waiver. *Id.* at 100.

*Miranda* rights, including the Fifth Amendment right to counsel, cannot be asserted outside the context of custodial interrogation. *See United States v. Clark,* 600 F.Supp.3d 251, 271–72 (W.D.N.Y. 2022) (Wolford, C.J.) *citing United States v. Zaleski*, 559 F.Supp. 2d 178, 189 (D. Conn. 2008) ("An individual cannot, therefore, assert his or her *Miranda* right to counsel before he or she is in custody.") Indeed, in *McNeil v. Wisconsin*, the Supreme Court remarked that it has "*never* held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" 501 U.S. 171, 182 n.3 (1991). The Second Circuit has adopted the *McNeil* Court's rationale, holding that a defendant can only invoke the Fifth Amendment right to counsel once it attaches in the context of custodial interrogation." *United States v. Thompson*, 35 F.3d 100 (2d Cir. 1994).

13

3.      **Miranda – Subsequent Provision of Warnings After Prior Questioning**

Even if an initial confession is improperly obtained without the required *Miranda* warnings, the government is not precluded from introducing a subsequent confession obtained after the warnings have been properly administered. *Oregon v. Elstad*, 470 U.S. 298, 318 (1985); *Tankleff v. Senkowski*, 135 F.3d 235, 244–45 (2d Cir. 1998). This principle does not, however, permit officers to employ a "question first" strategy, in which they deliberately withhold *Miranda* warnings until a suspect has confessed and then give the warnings in the midst of a coordinated and continuing interrogation. *See Missouri v. Seibert*, 542 U.S. 600 (2004); *see also United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (noting that *Seibert* creates an exception to *Elstad* rule but does not otherwise overrule it).

In *United States v. Capers*, 627 F.3d 470, 477–80 (2d Cir. 2010), the Second Circuit announced an objective, "totality of the circumstances" test, under which the government has the burden of proof, to determine whether a two-step interrogation by the police was deliberate. *See United States v. Williams,* 681 F.3d 35, 43–45 (2d Cir. 2012) (totality of circumstances showed that officer was not "intentionally undermining *Miranda*," and defendant's second set of statements was admissible despite earlier violation of *Miranda*). In determining whether a deliberate two-step interrogation occurred, courts consider the following five factors: (1) the completeness and detail of the questions and answers in the first round of interrogation, *see United States v. Moore*, 670 F.3d 222, 231 (2d Cir. 2012)); (2) the overlapping content of the two statements (where there is little overlap, this factor weighs in favor of the government), *id.*; (3) the timing and setting of the interrogations, *see United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012); (4) the degree of continuity of police personnel in

the two interviews, *see Moore*, 670 F.3d at 232; and (5) the time lapse between the two interviews, *id.*

### C.    Analysis

### 1.    Mr. Gogolack's Statements on PO Wojciechowicz's Body Camera

Mr. Gogolack's statements to (or in the presence of) PO Wojciechowicz of the Depew Police Department during their August 2, 2023 interaction are recorded on PO Wojciechowicz's body-worn camera.[4]  Mr. Gogolack moves to suppress "statements the defendant made to the Depew Police Officer" because they were "non-mirandized and the result of custodial interrogation."  The first body-worn camera video (*see* Exhibit H, VDPD-BC152_25_080223235229_3.mp4), depicts PO Wojciechowicz's interactions with the defendant, beginning at 19:06:21 (when PO Wojciechowicz approached Mr. Gogolack's window and states "Hey how we doin' today?") through 19:10:00 (when PO Wojciechowicz handcuffs Mr. Gogolack and announces over the radio "six dispatch, one in custody").  The statements that Mr. Gogolack made during the initial portion of the traffic stop, before he is placed in custody, are admissible because Mr. Gogolack was not yet in custody for Miranda purposes. *See Berkemer*, 468 U.S. at 438–440 (1984) (motorists subject to routine traffic stops generally are not in custody for purposes of *Miranda* – although motorists do not feel free to leave, traffic stops are not a form of custodial interrogation because they are brief and public.)

Once Mr. Gogolack is placed in custody, at about 19:10, the government concedes that he is in custody for the purposes of *Miranda* and, therefore, the analysis hinges upon which, if any, subsequent statements he made were the product of interrogation.  However, as noted, not all police questions constitute interrogation for the purposes of *Miranda*.

---

[4] *See*, Dkt. 723, Ex. H.

When PO Wojciechowicz asks Mr. Gogolack if any of his personal property is in the car, such as a cellphone, Mr. Gogolack responds "oh, along them lines" and "yeah, a cell phone, if you don't mind." *See* Exhibit H, VDPD-BC152_25_080223235229_3.mp4, at 19:11:21–19:11:34. Questions "normally attendant to arrest and custody" are not interrogation for purposes of Miranda. *United States v. Gotchis*, 803 F.2d 74 (2d Cir. 1986) (holding that question about where a defendant was employed falls within the benign category of basic identifying data required for booking and arraignment), *see also United States v. Casiano,* 862 F. Supp. 52 (S.D.N.Y., Aug. 24, 1994) (asking defendant whether a coat was his, in order to facilitate his transport to the police station, did not constitute interrogation).

For the same reason, Mr. Gogolack's statement "no I don't have a needle on me" in response to the officer's questions about whether he "has anything on [him] that is going to poke me or stick me?" (*see* Exhibit H, VDPD-BC152_25_080223235229_3.mp4, at 19:09:28) constitute questions posed for officer safety purposes and ordinarily asked during an arrest and therefore do not constitute interrogation. When Mr. Gogolack mutters "I told her she should have just came and got it herself" (Id. at 19:09:54) during the arrest process, it is not in response to police questioning[5] and therefore should be admissible against him. Mr. Gogolack's last statements depicted in the first body-camera video, shouting to his father that "they got me for driving without a license" (*see* Exhibit H, VDPD-BC152_25_080223235229_3.mp4, at 19:11:45) cannot reasonably be construed as anything other than spontaneous utterances, and are therefore admissible against him.

---

[5] To be clear, the officer says "what's that?" after Gogolack mutters the words the first time, but such can not credibly be called interrogation in the context of the video, where it is apparent from the evidence that the officer could not hear Mr. Gogolack's muttering of the spontaneous utterance the first time, and is essentially conveying that he did not hear him.

In his supplemental filing, Mr. Gogolack focuses most of his arguments on the statements made in the second body-worn camera video, depicting his transport from the vicinity of Donna Court to the Depew Police Department. As described in great detail *supra*, from the beginning of the second body camera video at about 20:17:18, until 20:20:50 (when PO Wojciechowicz asks Mr. Gogolack "How old was Crystal?"), nothing close to interrogation occurs. Instead, the video establishes that it is Mr. Gogolack who begins talking—and rambling—about Crystal Quinn, and who persists in talking about Crystal Quinn despite PO Wojciechowicz's evident disinterest at multiple junctures in the conversation. In fact, Mr. Gogolack continues talking even as PO Wojciechowicz communicates over his police radio (20:18:45) and even as PO Wojciechowicz attempts to redirect the conversation *away* from Crystal Quinn, and onto the more innocuous topic of the air conditioning (20:19:48).

To be sure, PO Wojciechowicz occasionally responds to things Mr. Gogolack is saying during that timeframe, offering such remarks as "What's up?" (20:18:20) in response to Mr. Gogolack's question "Wanna know what's really shitty?" Additionally, PO Wojciechowicz states things like "uh-huh" (20:18:31) and "no, I get you man" (20:18:45) in response to Mr. Gogolack's self-initiated monologue – but such remarks, in the context of the video evidence, plainly do not constitute a police interrogation. At one point during Mr. Gogolack's ramblings, he states "They just found her and dusted her off I guess, I don't know" (in the context of his claims that Crystal had previously attempted suicide and was found by her mother Sharon) (20:19:00 – 20:19:24). PO Wojciechowicz responds to these unsolicited statements with incredulity, making remarks like "Crystal's mom?", "Jesus!", and "They

17

dusted who off?" (20:19:27). And, as Mr. Gogolack points out, PO Wojciechowicz asked Mr. Gogolack to "hop over to the other side [of the vehicle] so that [he] c[ould] hear him."

But none of PO Wojciechowicz's casual responses and remarks to Mr. Gogolack's self-initiated ramblings can be described as interrogation, as multiple courts have recognized. *See McConer*, 530 F.3d at 497; *Tail*, 459 F.3d at 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation."); *Ayers*, 606 F.3d at 1235 ("Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response.").

By contrast, in *Seibert*:

> The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment.

542 U.S. at 616.

Unlike in *Seibert*, it was Mr. Gogolack—not law enforcement—who exhaustively and repeatedly raised the subject of Ms. Quinn and her death. Indeed, PO Wojciechowicz at times appears confused by what Mr. Gogolack is saying, at other times appears to be paying minimal attention (even talking to others on his radio as Gogolack rambles), and, again, at other times attempts to redirect the conversation away from the topic of Ms. Quinn and onto the topic of the air conditioning. None of that is consistent with police interrogation or an atmosphere more coercive than that ordinarily attendant with being in custody.

That same conclusion applies to PO Wojciechowicz's question to Mr. Gogolack (at 20:20:50), "How old was Crystal, she was young, right?" and Mr. Gogolack responds by describing the age gap between himself and Crystal Quinn. As the Second Circuit has

18

observed, there is "no bright line requiring a finding of custodial interrogation in every case in which a law enforcement officer interrupts a defendant's volunteered narrative to ask a question." *Rommy*, 506 F.3d at 132. And, here, PO Wojciechowicz appears to be expressing curiosity in the topic that Mr. Gogolack has, of his own volition and without prompting, been speaking about for the previous three minutes straight. PO Wojciechowicz, a local Depew Police Officer, was never involved in the investigation[6] into the death of Crystal Quinn, which occurred over 75 miles away. In any event, routine pedigree questions are not the stuff of interrogation. *See United States v. Rodriguez*, 356 F.3d 254, 259-60 (2d. Cir. 2004) (holding routine pedigree questions are not interrogation).

PO Wojciechowicz's involvement was to conduct the traffic stop. It is hard to imagine how, given his limited role, PO Wojciechowicz's participation in a conversation initiated and continued by Mr. Gogolack can be retrospectively re-cast as a police interrogation. This is further evidenced by the fact that, even after Mr. Gogolack answers the question about Ms. Quinn's age, he continues on to new topics, not addressed or solicited by PO Wojciechowicz in any way. For example, Mr. Gogolack begins discussing Ms. Quinn's involvement in "that Peter Gerace case" and remarks that "the feds" are "Fucking sickos dude" (20:21:08). As evidence of his general lack of interest in what Mr. Gogolack is saying (and therefore evidence that this was no interrogation) PO Wojciechowicz responds to this by stating "really . . ." in a tone that is best described as a polite feigning of interest. PO Wojciechowicz's lack of follow up is further evidence that his casual interactions with Mr. Gogolack did not amount to an interrogation.

---

[6] Aside from assisting the FBI by conducting a traffic stop of a motorist in his jurisdiction who was driving with a revoked license.

19

Mr. Gogolack then continued onto another topic that PO Wojciechowicz did nothing to entice, stating "Like I said, I ran into her randomly and I had no idea about the shit that was going on". 20:21:52. PO Wojciechowicz responded by stating "are you talking about Crystal, like you ran into her randomly?" Id. at 20:22:04. Once again, this question in context appears to be PO Wojciechowicz asking a clarifying question to Mr. Gogolack, not expanding the topic of conversation or interrogating him. *See Rommy*, 506 F.3d at 132–34. This is further corroborated by the interaction when Mr. Gogolack brings up Hoak's bar, which prompted the next question that PO Wojciechowicz asks: "the fish place? I heard about that place, I heard it's a good joint." 20:22:19. In the government's view, this appears to be the first time that PO Wojciechowicz expresses any genuine interest at all in what Mr. Gogolack is saying. As further evidence that he was not conducting an interrogation, PO Wojciechowicz did not ask Mr. Gogolack any questions in the vehicle about the status of his driver's license, the actual crime that PO Wojciechowicz *was* investigating.

As Mr. Gogolack describes how impressive the lightning was as it came in over the lake during a summer storm, PO Wojciechowicz remarks "Uh-huh" and "Niiiiice" (20:22:35) but such remarks are once again nothing more than humoring the defendant's remarks to pass the time on the trip to the Depew Police Department. *Tail*, 459 F.3d at 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation."). It is Mr. Gogolack once again, and without prompting, who redirects the conversation from lightning storms to Ms. Quinn, and his time with her before heading to Wellsville. 20:22:38. Instead of asking follow-up questions about Mr. Gogolack's time with Ms. Quinn immediately preceding her death—questions that may have furthered an investigation into her death—PO Wojciechowicz instead asks Mr. Gogolack "So how back do you, how far back do you and

20

Crystal go?" 20:22:55.  Not only was that question within the scope of the statements Mr. Gogolack previously volunteered, it reflected PO Wojciechowicz's polite, casual engagement with Mr. Gogolack about a person Mr. Gogolack continued to discuss unprompted. Completely absent are any questions which could reasonably be expected to produce an incriminating response.  The same can be said for PO Wojciechowicz's follow-up question about whether Mr. Gogolack is "from around here?" (20:23:05) and his question about where Mr. Gogolack lives now "No kidding, and now you live where, Wellsville?".  These questions fall far short of police interrogation and would be more appropriately described as idle chatter – the same sort someone might have with a stranger sitting next to them at a Buffalo Bills game.

The remaining portions of the interaction, as depicted on the video, establish that PO Wojciechowicz was not engaged in an interrogation.  He asks no additional questions, and follows up the voluntary and spontaneous statements by Mr. Gogolack with remarks like "gotcha" (20:24:00), "Oh, for sure" (20:24:19 and 20:24:55), and "uh-huh" (20:25:01).

The evidence establishes that PO Wojciechowicz, a local police officer that was not involved in investigating the death of Ms. Quinn, did nothing more than entertain Mr. Gogolack's determination to talk about Ms. Quinn during the transport to the Depew Police Department.  In fact, at times it appears PO Wojciechowicz was fairly disinterested in what Mr. Gogolack had to say.  Such an interaction, initiated by Mr. Gogolack over and over again, cannot possibly be the sort of situation which motivated the decision issued in *Miranda*.  PO Wojciechowicz's interactions with Mr. Gogolack during the transport to the Depew Police Department do not "reflect a measure of compulsion above and beyond that inherent in

21

custody itself."[7]  *Innis*, 446 U.S. at 301.  For those reasons, all of Mr. Gogolack's statements depicted in the Depew PD Body-Worn Camera should be admissible against Mr. Gogolack at trial.

### 2. Mr. Gogolack's Statement to the FBI inside of the Depew Police Department

The FBI agents did not deliberately engage in a two-step interrogation process designed to undermine the effectiveness of *Miranda* warnings that were ultimately provided to Mr. Gogolack.  Mr. Gogolack does not go so far as to allege any actual facts in support a claim that such a deliberate two-step interrogation process did occur, instead claiming that the government has thus far failed to meet its burden to establish that such a deliberate two-step interrogation process did *not* occur.  The law is clear that in circumstances such as these it is, in fact, the government's burden to establish that no such conduct occurred.  *See Capers*, 627 F.2d at 480.  Here, the government has met its burden.

The sworn affidavits of SA Kammeraad (Ex. 1) and SA Penna (Ex. 2) dispel any notion that the FBI agents here engaged in a deliberate, two-step interrogation process designed to undermine the effective conveyance of subsequent *Miranda* warnings.  First, as a general matter, these rules exist to prevent the government from deliberately obtaining an initial, un-warned, confession, and then providing the warnings and eliciting the same confession.  Factually, that is obviously not what happened here.  As SA Kammeraad describes in his affidavit, the initial conversation with Gogolack was so general, surface-level, and meandering that he did not even feel it was necessary to notate the things that Mr. Gogolack said to him.  SA Kammeraad describes, in his affidavit, that his conversation with

---

[7] It is also unavoidably true that Mr. Gogolack, an experienced actor in the criminal justice system who was, at that moment, experiencing at least his ninth arrest, would not have confused PO Wojciechowicz's engagement in a casual conversation as a custodial interrogation.  See Dkt. 723, Ex. K (Gogolack Criminal History).

Mr. Gogolack was brief, and that the topics they discussed were much more limited than the actual interview which occurred over the course of 90 minutes at the Depew Police Department approximately two hours later. SA Kammeraad described his motivations for the initial discussion, including to introduce himself, to explain why the FBI wanted to talk to Mr. Gogolack, and to build some rapport. To the extent that SA Kammeraad essentially provided a preview of the topic of some of the questions that would follow in a formal, *Mirandized* interview, he did engage in custodial interrogation without first advising Mr. Gogolack of his *Miranda* warnings. The government does not seek to introduce those un-Mirandized statements at trial.[8] However, the law does not require that later, *Mirandized* statements be suppressed unless the totality of the circumstances establish that a two-step interrogation by the police was deliberate. *See Missouri v. Seibert*, 542 U.S. 600 (2004); *see also United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (*Seibert* creates an exception to *Elstad* rule but does not otherwise overrule it); *see also Capers*, 627 F.3d at 477–80 (establishing an objective, totality of the circumstances test).

SA Kammeraad's affidavit addresses each of the five factors outlined in the caselaw as factors for courts to consider in reaching this determination. Regarding the first factor—the completeness and detail of the questions and answers in the first round of interrogation—SA Kammeraad described this initial interaction as brief and general, in which he did not ask follow-up questions, where much of the time was the defendant rambling, and where SA Kammeraad did not recall getting significant responses. This factor weighs in favor of the government's position that no deliberate two-step interrogation took place.

---

[8] The government would be hard-pressed to do so anyway, given that the encounter was so general and brief that SA Kammeraad did not document (and does not recall) specific questions he asked or specific answers that Mr. Gogolack gave.

So, too, does the second factor—whether the two statements overlapped in content. SA Kammeraad described, in his affidavit, how the content of the interview at the Depew Police Department was "significantly broader in scope" and included detailed questions and explanations about the timeline of Simon Gogolack's interactions with Crystal Quinn leading up to her death in Wellsville, as compared with what he described as a brief and general discussion by the side of the Depew Police vehicle. This factor weighs in favor of the government's position that no deliberate two-step interrogation took place because many of the questions and answers that Gogolack provided in the 90-minute interview were not (and could not) have been covered during the brief 15-minute interaction by the side of the vehicle.

The third factor—the timing and setting of the interrogations—also weighs in favor of the government. The *Seibert* rule is designed to prevent law enforcement from engaging in mid-stream Miranda warnings, where police obtain a confession from a defendant, then Mirandize him, and then re-obtain the same confession. Here, there was no initial confession at all. Instead, SA Kammeraad engaged in a brief, general, informal discussion with Mr. Gogolack by the side of a vehicle in which he introduced himself, explained why the FBI wanted to talk to Mr. Gogolack (which included posing a few of the initial questions), and attempted to build rapport. That setting is dramatically different than the formal interview later conducted at the Depew Police Department, in an interview room recorded for video and audio, and accompanied by *Miranda* warnings.

The timing is also different. As SA Kammeraad explained in his affidavit, the first brief discussion occurred shortly after Mr. Gogolack was arrested by the Depew Police Officer, and the second more formal interview occurred approximately two hours later, after Mr. Gogolack had been transported away from the scene and undergone the booking process.

24

This factor also establishes that the agents did not engage in a deliberate, two-step interrogation.

The fourth factor—the degree of continuity between the police personnel—slightly weighs in the government's favor. Here, both SA Kammeraad and SA Penna's affidavits establish that SA Penna was not a participant in the initial, unwarned conversation with Mr. Gogolack. SA Penna is, however, an active participant in the formal, Mirandized interview. Furthermore, SA Penna indicates that he does not recall SA Kammeraad even informing him about his [Kammeraad's] prior discussion with Mr. Gogolack. That fact further undermines any argument that the FBI agents here deliberately engaged in a "question-first" tactic designed to undermine *Miranda* warnings.

Fifth, and finally, courts consider the time lapse between the two interviews. While SA Kammeraad does not know exactly when his brief interaction by the car with Mr. Gogolack occurred, he recalled that it occurred "shortly after" Mr. Gogolack was placed in the rear of the Depew vehicle, a fact which is corroborated by PO Wojciechowicz's body-worn camera, which shows SA Kammeraad standing near the Depew Police vehicle as Mr. Gogolack is being placed inside. SA Kammeraad estimates that the entire interaction with Gogolack by the side of the vehicle lasted 15 minutes, which supports the inference that the conversation ended sometime around 7:30pm. The subsequent *Mirandized* interview of Mr. Gogolack did not begin until after 9:30pm, about 2 hours later.

The affidavits of SA Kammeraad and SA Penna, two individuals with personal knowledge about their interactions with Mr. Gogolack on August 2, 2023, as well as the totality of the surrounding circumstances, establish that Mr. Gogolack was not subjected to a deliberate, two-step interrogation process. For those reasons, the government respectfully

25

requests that the Court deny Mr. Gogolack's motion to suppress his statements, made after he knowingly and voluntarily waived his *Miranda* rights in the video-recorded interview room at the Depew Police Department.

### 3.    Mr. Gogolack did not invoke his right to counsel.

Mr. Gogolack has previously raised claims that he invoked his right to counsel during the recorded interview at the Depew Police Department and, so far as the government can tell, he raises no new claims in his supplement filing.  The government has previously addressed the facts and the law related to this issue in its initial response brief (Dkt. 723).  The government relies on the evidence in the record (including the entire video-recorded interview) and its prior briefing on this subject.  Nothing about Mr. Gogolack's statements can be construed as a sincere, genuine invocation of his right to counsel.  Mr. Gogolack's arguments in his supplemental brief, cherry-picking statements from the recorded interview, fail to stand up to scrutiny when the entire interview is reviewed.  The defendant's motion to suppress these statements should be denied.

### II.    Mr. Gogolack's Speedy Trial Motion to Dismiss Should Be Denied.

In his Supplemental Affidavit, Mr. Gogolack continues to press his debunked claim that the government delayed Mr. Gogolack's case from October 16, 2023, through February 23, 2024, by depriving him of "thousands of pages of discovery" related "to both the September 13, 2023 Indictment and the September 20, 2023 Superseding Indictment." *Id.* at 7 ¶ 15 (citing Gogolack Ex. C).  In that vein, Mr. Gogolack identifies ten sets of documents from the government's May 24, 2024, discovery production that he claims should have been produced by October 16, 2023:

1.  GOV-00000037–GOV-00000063;
2.  GOV-00000335–GOV-00000351;
3.  GOV-00000352–GOV-00000365;

4. GOV-00003108–GOV-00003112;
5. GOV-00009684–GOV-00009793;
6. GOV-00011975–GOV-00012391;
7. GOV-00012392–GOV-00012496;
8. GOV-00012497–GOV-00012806;
9. GOV-00029150–GOV-00029153; and
10. GOV-00029157–GOV-00029158

*See id.* at 19–21 (Ex. C).

Though Mr. Gogolack's brief is heavy on charges against the government for deliberately or recklessly withholding discovery, it is correspondingly light on facts and the specifics of how the timing of certain, specific discovery disclosures injected delay into his case. A careful examination of the facts and a cursory interrogation of Mr. Gogolack's argument underscore that his speedy trial motion to dismiss should be denied.

Start with the facts. As documented in Exhibit 4,[9] Mr. Gogolack claims that 107 items of discovery germane to the first two indictments returned against Mr. Gogolack should have been produced by October 16, 2023. For starters, approximately 36 of those items *were* produced in the government's October 19, 2023, production. Approximately 71 items of discovery were not produced in the government's October 19, 2023, production. *See* Ex. 4.

But only one of those 71 items arguably should have been produced. Approximately 28 consist of non-discoverable law enforcement reports or cover sheets for discovery produced on October 19, 2023. *See id.*; *see* Fed. R. Crim. P. 16(a)(2). Nineteen—including several Niagara County Incident Reports related to Mr. Gogolack's misconduct while in pre-trial detention—were not generated until *after* the October 16, 2023, production deadline, making it impossible for the government to produce them *by* the deadline. *See* Ex. 4. Seven items are *Jencks Act* material, and therefore are not discoverable under Rule 16, though the government

---

[9] Exhibit 4 is an excel spreadsheet and will therefore be provided natively to the Court and Counsel. A coversheet will be added to the docketed version indicating that Exhibit 4 was provided natively to the Court and Counsel.

27

produced them anyway on June 5, 2024.  Fourteen items, such as historical police reporting on Mr. Gogolack and requests for laboratory examinations concerning drugs seized from his co-defendants, were unrelated to the initial indictments returned against Mr. Gogolack and may not be discoverable under Rule 16(a)(2) anyway.  The final three items consist of Mr. Gogolack's criminal complaint, which was provided to his counsel at his initial appearance, a non-discoverable FBI import form relating to the charging out of drug evidence, and 23 photographs of blankets and marijuana (GOV-00012368-12391) captured in other photographs.  So, of the "thousands" of pages of discovery that Mr. Gogolack charges the government of deliberately withholding, only 23 photographs actually constituted discoverable material that was inadvertently not produced in the government's October 2023 discovery production.[10]

Mr. Gogolack does not explain why a production delay involving 23 photographs caused him to seek an adjournment of his motions deadline not once, but twice, and then ignore the third deadline entirely.  *See* Dkt. 17 (First Scheduling Order) (ordering motions to be filed by November 22, 2023); Dkt. 21 (Second Scheduling Order) (ordering motions to be filed by December 15, 2023); Tran. Arraignment on Superseding Indictment, at 8, (dated Sept. 25, 2023) (counsel for Mr. Gogolack asking for 60 days to review discovery); Dkt. 22 (counsel for Mr. Gogolack seeking a 30-day adjournment of the December 15, 2023, deadline to file motions); Dkt. 23 (Third Scheduling Order) (ordering motions to be filed by January 16, 2024).  That is because there is no causal relationship between the delayed production of those 23 photographs and Mr. Gogolack's motions to adjourn his briefing schedule.  As the record

---

[10]     Notably, those photographs were of items seized from Mr. Gogolack's residence after they were brought to an FBI facility.  Other photographs of the blankets and marijuana were produced in the October 2023 discovery production.

demonstrates, Mr. Gogolack sought to delay his own case so that he could enjoy more time reviewing discovery and preparing motions. *See* Tran. Arraignment on Superseding Indictment, at 8, (dated Sept. 25, 2023); Dkt. 22. Mr. Gogolack does not—and cannot—contest that he had all of the material he needed to file motions by his motions deadline. Accordingly, any blame for the delay between October 16, 2023, and February 23, 2024, falls squarely on Mr. Gogolack's shoulders.

Second, even if Mr. Gogolack were correct and the government inadvertently failed to produce "thousands" of pages of discovery, Second Circuit precedent dictates that speedy trial time cannot be charged against the government unless it delayed the production of discovery in bad faith or chronically disregarded its discovery deadlines. *See United States v. Esquilin*, 205 F.3d 1325, 2000 WL 232162, at *2 (2d Cir. 2000) (Summary Order) (rejecting the defendant-appellant's contention that the government's failure to produce certain Rule 16 discovery material until only a few weeks before the trial led to violations of the Speedy Trial Act and the Sixth Amendment where there was no evidence that the government's failure to comply with discovery deadlines was "chronic or in bad faith"); *see id.* ("[L]ike the Speedy Trial Act, the Sixth Amendment counts delay due to government failure only where that failure was in bad faith." (citing *United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir. 1990)); *Vasquez*, 918 F.2d at 338 (rejecting the defendant-appellant's request to charge the government with constitutional speedy trial time where "the government's failure to promptly carry out [his] competency examination . . . was the result of 'institutional dysfunction' rather than deliberate wrongdoing or bad faith").

In response to this precedent, Mr. Gogolack asserts that "[e]ven where the delay at issue is neutral, the Court must determine who bears the responsibility for the delay." Dkt.

29

751 at 7 ¶ 16. But that objection misses the mark. The issues here are: (1) whether there is a causal relationship between any delay in producing discovery—be it as limited as 23 photographs or as extensive as "thousands" of pages of documents—and *Mr. Gogolack*'s decision to move to adjourn his motions deadlines and, secondarily, (2) whether there is a causal relationship between the adjournment of Mr. Gogolack's motions deadlines and the scheduling of his trial for June 8, 2026. Because Mr. Gogolack makes no attempt to answer either of those questions, and because the record does not support any conclusion favorable to Mr. Gogolack, his motion should fail.[11]

**CONCLUSION**

For the reasons stated herein, the government respectfully asks the Court to deny Mr. Gogolack's omnibus dispositive motions (Dkt. 690) in full.

DATED: Buffalo, New York, February 18, 2026.

Michael DiGiacomo
United States Attorney

BY:   s/ CASEY L. CHALBECK
s/ NICHOLAS T. COOPER
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5881
Casey.Chalbeck@usdoj.gov

---

[11]   The unstated principle animating Mr. Gogolack's speedy trial motion appears to be that the Court should rescind the exclusion of speedy trial time due to alleged discovery delays. Under this logic, the rescission of the exclusion of time serves to penalize the government for a discovery delay, irrespective of whether a defendant can demonstrate that discovery delay delayed the case. For this penalty to be available to Mr. Gogolack, however, he must make "a showing" that the government acted in "bad faith" or otherwise engaged in "unjustifiable conduct." *United States v. Dafna*, No. 19-CR-408 (MKB), 2024 WL 4424241, at *6 (E.D.N.Y. Oct. 5, 2024) (internal quotations omitted) (collecting cases). Mr. Gogolack's conclusory declaration that the government acted in bad faith is not a "showing," *id.*, and, as the record demonstrates, the government has not at any point acted in bad faith in this litigation.