IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

**23-CR-99-EAW**

v.

SIMON GOGOLACK

## RESPONSE ON BEHALF OF DEFENDANT SIMON GOGOLACK TO THE GOVERNMENT'S MOTION SEEKING TO ADMIT NONTESTIMONIAL HEARSAY STATEMENTS OF CRYSTAL QUINN AND EVIDENCE OF AN ALLEGED UNRELATED INCIDENT.

_____

Dated:        May 15, 2026

By:    NICHOLAS T. TEXIDO, ESQ.
69 Delaware Avenue, Suite 1100
Buffalo, New York 14202
(716) 306-5251
nick@texidolawwny.com

PETER M. KOOSHOIAN, ESQ.
80 W. Huron Street
Buffalo, New York 14202
(716) 854-1300
pk@bufflaw.com

Attorneys for Defendant Simon Gogolack

## INTRODUCTION

The Government has moved for admission at trial of several of Crystal Quinn's text messages and other non-testimonial statements prior to her death.  The Government has also moved to admit evidence of an alleged kidnapping/robbery of Government witness CB.

### *As to all nontestimonial hearsay from Crystal Quinn*

Although the Government is not required to establish reliability in order to admit nontestimonial hearsay (Crawford v. Washington, 541 U.S. 36 [2004]), the reliability of the evidence necessarily comes into play during the requisite analysis of whether the probative value is substantially outweighed by the risk of unfair prejudice.  Rine's statements to Quinn in the paragraph above, in admonishing Quinn for delusional and paranoid disbeliefs, has a very strong impact on the probative value of Quinn's thoughts, beliefs, and observations in general.  Woollsey v Nat'l Transp. Safety Bd. (5th Cir. 1993) ["[i]t is not the hearsay nature per se of the proffered evidence that is significant, it is the probative value, reliability, and fairness of its use that are determinative"].

This Court's 403 balancing thus serves as a check on unreliable hearsay.  The Second Circuit's stated purpose of Rule 403 balancing is performed, in part, "in order to avoid the admission of facially unreliable hearsay." United States v. Dhinsa, 243 F.3d 635, 654 [2nd Cir. 2001].

Here, tragically, and as is all too common, the hearsay declarant was badly addicted to drugs, and was spiraling out of control.  While the statements will be addressed in individual groups of statements, 403 balancing, and by extension, analysis of its reliability, is required.  In conducting that analysis, there is no conceivable way that many of the statements can be admitted, as they relate perceptions, beliefs, and thoughts that were paranoid, delusional, and impacted by severe sustained and current drug use, as will be demonstrated below.

***Statements about fear of cooperating and fear of bikers (17-31)***

Statements 17-19 encompass statements Crystal Quinn allegedly made to Josh Rine.  Specifically, the Government seeks to establish that Quinn told Rine that Gerace had her sleeping with police detectives, that she was cooperating with the FBI and the DA's Office and that she was afraid of Gerace and the outlaws.

As to Statement Number 17, the Government argues that Quinn's claim that Gerace "had" her sleeping with police detectives is not a statement against Quinn's penal interest.  F.R.E. 804[b][3].  She was permitted to sleep with police detectives if she chose, and the general import of her statement was that she was a victim of Gerace's forcing or paying her to have sex.  The analysis of whether prior statements are admissible under this section relies on whether the statement was truly against the declarant's interest, which requires a fact-intensive inquiry.  United States v. Costa, 31 F3d 1073 [11th Cir. 1994].  Here, the overall thrust of the statement is that she is a victim of Gerace's wrongdoing.

Moreover, where there is no indication that a declarant was able to appreciate that their statement was inculpatory, this exception does not apply.  United States v. Two Shields, 497 F3d 789 [8th Cir. 2007].  Here, there was no indication that Quinn believed her statement of being a victim of Gerace's sex trafficking was against her penal interest, and it should be excluded on that basis.

As to all of the statements to Rine, as well as the statements to Sharon Quinn and John Greico,, they should not be admitted as evidence of Quinn's then-existing mental, emotional or physical condition pursuant to F.R.E. 803[3].  The import of

these statements is that Quinn was afraid of Gerace and bikers, and that she intended to come home.

As to the statements of Quinn's fear of bikers and her belief that they would harm her, statements of memory or belief cannot be used to serve as a basis for an inference of the happening of the event which produced the state of mind. Shepard v. United States, 290 U.S. 96 [1933]. That is exactly what the Government seeks to do here. They seek to prove that she was afraid of bikers because that, in the Government's mind, indicates that it was bikers who killed her (statements 20-30).

Moreover, any probative value of Crystal Quinn's belief of what would happen is slight, and outweighed by the danger of unfair prejudice. The issue to be tried is not whether Crystal Quinn *believed* that bikers would harm her; rather, it is whether the defendants did, in fact, harm her. Her belief of what could happen is of very little, if any, probative value.

That probative value is further diminished by their inherent unreliability. The Court is aware of all of the factors weighing against Quinn's reliability, and they will not be repeated here. Further, in the same conversation with Rine, Quinn remarked

that she was picked up and taken to Wellsville because she told her probation officer that she was assaulted.  As we all know, this was untrue.  The Court should not admit other hearsay statements between Rine and Quinn due to the inherent unreliability of all of the remarks.

Even Rine, the recipient of some of the statements, has remarked that Quinn was delusional and paranoid.  On July 30, 2023, Quinn texted Rine that the feds had video of his house.  He responded "Lol no they don't!  You act like someone flew drones over my house!  Why are you like this all the time?  So paranoid of stuff?  We never did anything illegal or wrong.  You need to lay off the stuff babe."

Rine's admonitions precisely lay out why Quinn's perceptions and beliefs should not be permitted as hearsay.  Where testimony or evidence is so unreliable, and it is admitted under a hearsay exception without benefit of cross-examination, it is more prejudicial than probative and should not be admitted into evidence.

We do not object to statement 31 ("Quinn said Simon was gone, and she was making eggs").

*Statements 32 and 33—Alleged 7/28/23 biker confrontation*

In her text messages to Simon Gogolack and to the phone number she thought belonged to DW, Crystal Quinn described an incident in which red lasers were pointed at her. She mentioned bikers and five girls coming to beat her up. She vacillated between thinking Simon Gogolack was involved and thinking that she and Simon were victims, ultimately landing on the latter.

Videos retrieved from Quinn's phone tell a different story. While these text messages were being sent, at 5:52 A.M. (which is believed to be 1:52 A.M. when taking UTC into account), Quinn took a short video from the front window of the home. The video shows white light off in the distance, and Quinn can be heard saying "Scumbag motherfuckers" as she takes a picture/video through the window. No red lasers or people appear outside. Six minutes later, at 5:58 A.M. UTC, she inadvertently took a short video of her foot. She was inside, and no other people could be heard. The lights were on, and all was quiet.

At 5:56 AM UTC, in between the taking of those videos, Crystal Quinn texted to DW's expired contact: "I think they allow 5 girls to come in and whip my ass so I can here then" and "Jumping me now." However, the video evidence indicates that

there were no girls at the scene and that Quinn was never jumped, and also that there were no red lasers, at least at the time of the creation of the videos.

The Government seeks to admit these statements as excited utterances. In order to establish excited utterances, the Government must show (1) the occurrence of a startling event, (2) that the declarant made the statement while under the stress of excitement caused by the event, and (3) that the declarant's statement relates to the startling event. United States v. Wilson, 642 F.Supp3d 380, 389 [WDNY 2022]. Of course, the statements also must be more prejudicial than probative, and therefore, not so unreliable as to have little to no probative value.

Here, the Government cannot show that any startling event actually occurred, nor that Quinn was under the stress of that event when she sent the text messages. The videos taken at the time by Quinn show that she was not excited. She dryly remarked "Scumbag motherfuckers" in one video. In the other, she was silent and in a well-lit room with her foot on her knee.

The videos show two things: (1) that no red lasers nor people were outside the house, and (2) that Quinn was quietly sitting alone in a well-lit room, and therefore not under the stress and excitement of any startling event.

Geofence information indicates that there was no evidence of bikers or anyone unusual in the area (Orlando GJ, 60 *et seq.*), which casts further doubt on Quinn's, and maybe even Gogolack's observations.  Here, there is no "extrinsic corroborating evidence that a startling event had occurred," outside of Quinn's texts and perhaps Gogolack's conversation with his father.  Because of the untrustworthy nature of the statements, this Court should require extrinsic evidence of the events under these circumstances, as a District Court did for the same reason in <u>Schroeder v. de Bertolo</u>, 942 F.Supp 72 [1996].  Here, it is not only that the occurrence of the event is not proven by extrinsic corroborating evidence; rather, the problem is that the available evidence casts doubt on whether the startling event actually occurred.

While Simon Gogolack recounted the laser story to Paul Gogolack in the following days, it is unclear from Paul Gogolack's statements whether Simon got that information from Crystal Quinn or from personal observation.  Moreover, adding another person's drug-influenced memory of the incident would not add much reliability in any event.  In reality, we have no idea what happened that caused Quinn and/or Gogolack to believe that lasers were being pointed at them.  Allowing Quinn's belief that it was five unspecified females, or "bikers" generally, where the

statements are unreliable and contradicted by other evidence to be presented to the jury would be prejudicial.  The evidence will merely invite speculation.

### *Alleged Kidnapping*

In order to establish admissibility, the Government must satisfy a four-part test, showing that the evidence is offered for a proper purpose, relevant to a disputed issue, probative value not substantially outweighed by prejudice, and a limiting instruction should be given, if requested.  United States v. Brand, 467 F.3d 179 [2d. Cir. 2008].

Here, the evidence is not being offered for a proper purpose, not relevant to a disputed issue, and the prejudicial effect far outweighs any probative value.  The Government argues that the evidence establishes a unique modus operandi, arguing that Gogolack lured a person into his home and held him at gunpoint.

There is no similarity between the prior incident, in which Gogolack allegedly held an individual at gunpoint over a stolen package, and the current incident in which the Government argues that he purposely gave Quinn fentanyl-laced drugs with the intent to silence her as a witness.  This limits any potential connection

between the prior alleged conduct and the allegations to be tried.  To be short, there is no "propensity-free chain of reasoning" that would warrant introduction of evidence of the alleged kidnapping.  United States v. Seals, 813 F.3d 1038 [7th Cir. 2016].

Furthermore, to be relevant for a particular non-propensity purpose, the prior act must be similar to the charged offense in order to establish the asserted inference. United States v. Henthorn, 864 F.3d 1241 [10th Cir. 2017].  Moreover, the Government must "identify a similarity or connection between the two acts that makes the prior act relevant" to the identified purpose." United States v. Henry, 23 F.Supp3d 131 [EDNY 2014].  Here, the allegations at bar at the trial and the prior bad act only share violent criminality and location, and nothing else.

The Government argues that Gogolack lured Quinn to Wellsville, just like he allegedly lured an individual into his house on the prior occasion.  The digital evidence contradicts any claim that Gogolack was lured to Wellsville.  Gogolack texted several other individuals to no avail before eventually asking Quinn for a ride. He then blew her off for a couple days, making her angry.  Eventually, they left for Wellsville a couple days later.  All the while, Gogolack was refusing Quinn's

requests to bring her opioids.  Quinn's texts to her mother indicate that she was not lured as well (Government Spreadsheet, Statements 22).

The Government further speculates that Gogolack may have held Quinn at gunpoint and forced her to take fentanyl-laced drugs, just like he held the prior witness at gunpoint.  There is no evidence that Gogolack pointed a gun at Quinn. An examination of the various ammunition scattered throughout the house indicates that none of it was racked through weapons.  There was a shotgun under a bed in another room.  There is no evidence whatsoever that the shotgun was anywhere but under that bed when Quinn took a fatal dose of fentanyl.  Any assertion to the contrary is pure speculation and should not be the basis to admit evidence of Gogolack's prior bad acts.

Where the only chain of reasoning supporting introduction of prior bad act evidence requires the jury to infer criminal character and then infer that the defendant acted in conformity with that character, the evidence must be excluded. United States v Brown, 880 F.2d 1012 [9th Cir. 1989].  The proponent must identify "the proper purpose for which it will use the other acts evidence and explain how that evidence fits into a chain of inferences—a chain that connects the evidence to [each] proper purpose, no link of which is a forbidden propensity inference." United

States v. Hall, 858 F.3d 254, 266 [4th Cir. 2017].  Here, the Government's entire theory of admissibility relies upon Gogolack acting in conformance with prior bad acts.

Furthermore, this evidence is more prejudicial than probative, in light of the tenuous connection between the offenses and the violent nature of the prior bad act. Prior bad acts evidence "raises special concerns about unfair prejudice because it almost always carries some risk that the jury will draw the forbidden propensity inference."  United States v. Bryant, 814 F.Supp 976 [N.D. Illinois, 2026].

The events described in the prior act are heinous and disturbing.  It is alleged that Gogolack wrapped himself in plastic and tied someone to a chair in his basement over a package that had been stolen from his porch.  If the jury believes this evidence, there is a substantial risk that the jury will consider the evidence as proof of Gogolack's violent propensity.  United States v. McPartland, 81 F4th 101 [2d Cir. 2023] [warning against the risk that "the trial would transmogrify into a reckoning on [the defendant's] character"].  Even if they do not fully believe the evidence, there can be a cumulative effect, and a feeling that someone would have to be extraordinarily unlucky to be falsely accused multiple times. The probative value to any material issue other than Gogolack's violent propensity is slight, if any, and any

slight probative value is outweighed by the danger of unfair prejudice.  Huddleston

v United States, 485 U.S. 681 [1988] [explaining that proper purpose, the relevancy

requirement, and Rule 403 balancing all protect against the danger of unfair

prejudice when Rule 404(b) evidence is admitted].

For all of these reasons, any evidence of an alleged robbery/kidnapping of CB

must be excluded.

**CONCLUSION**

For all of these reasons, the Government should be precluded from offering

the evidence set forth herein.

Dated:        May 15, 2026

By:            _____
                NICHOLAS T. TEXIDO
                Attorney for Simon Gogolack